Herman Ray CANTRELL, Appellant,

v.

The STATE of Texas, Appellee.

No. 60975.

Court of Criminal Appeals of Texas,
En Banc.

May 20, 1987.

Robert T. Baskett (Court appointed), Dallas, for appellant.

Henry Wade, Dist. Atty. & Steve Wilensky & David Schick, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for aggravated robbery. The punishment, enhanced by allegation and proof of a prior felony conviction (murder without malice), was assessed at life imprisonment by the court following the jury verdict of guilty as to the aggravated robbery.

At the outset appellant contends the court erred in admitting before the jury evidence of a subsequent extraneous robbery offense. It is necessary to set forth briefly some of the facts of the case in order to properly dispose of this and other points of error.

Phillip Green, 41, testified that during the summer of 1973 he was introduced to Phyllis Galyean at T.G.I. Friday's, a Dallas restaurant, when he was having dinner with Carol Greene, whom he was dating at the time. Several months later Phyllis Galyean began to telephone him periodically asking "to get together with me." At the time of her third phone call, in October of 1973, she professed her prowess at fellatio. Green related Galyean told him he was really missing something as "she was the best blow job since Linda Lovelace." Green acceded to her desire to visit him, and she came to his apartment. They engaged in oral sex. Galyean visited at Green's apartment on some six or seven times, two of the occasions they engaged in sexual relations, the others were merely social visits when she came with friends. Green admitted that, being a single man, he had some unique type of sculptures, fixtures and furniture in his house. He related that after Galyean's last visit in about June, 1974, he had several telephone conversations with Galyean, and learned in one that she intended to marry a man named Herman.

About eight months later, about 9 a.m. on February 12, 1975, Green was showering when he heard his doorbell ring. Wrapping himself in a towel, he went downstairs and opened the front door. He observed Phyllis Galyean there with a man whom he identified as the appellant Cantrell. Appellant asked Green if Green knew who he was, and when Green replied in the negative, appellant stated they were coming in the apartment. Green attempted to shut the door, but the appellant put his foot in the opening and drew a .38 cal. snub-nosed revolver out of his belt. Galyean and appellant entered the foyer and appellant immediately slapped Green twice on each side of his face. While pointing the weapon, appellant then told Green,

"Listen, you son of a bitch ... I am here because of what you did to Phyllis. You attacked Phyllis, and had sex with her, and I need money for psychiatric help." Green protested and said Galyean was a liar. Appellant responded, "I don't want to hear that. Phyllis told me you raped her." Appellant told Green to take off his towel and then pushed him into a chair. He placed the gun in his belt and then drew out a knife and told Green "I came here for money, and I am going to get money. I am going to cut your balls out if I don't get it." Green hedged, and at that point appellant ripped open his shirt revealing body scars apparently from gunshot wounds. Appellant told Green it didn't matter whether he lived or died, that he wanted money. When Green convinced appellant he had no money in the house, appellant demanded a check for $5,000.00 to be made payable to Galyean, and escorted Green to the kitchen where Green made out the check.

Appellant told Green that Galyean would cash the check while he waited outside Green's house, and if the payment on the check was stopped or if anyone came after Galyean or him he would kill Green, and that if the police were called he would return and "blow you apart." Appellant and Galyean left the house.

About 10 minutes later Green received a call from Howard Wilder at the Inwood National Bank asking whether to cash the check, stating the payee claimed it was an insurance settlement. When Green received a description of the woman who was attempting to cash the check and learned she was apparently alone, he told Wilder to cash the check.

Green called his attorney and requested a private investigator handle the case. The next day the investigator arranged a meeting for Green with Dallas police officers. Over a month later Green selected appellant's picture from a photographic spread.

Dallas Police Officer Stanley McNeer later learned appellant had gone to Houston. A warrant was forwarded to the Houston police. Sam Nuchia, Houston police officer, arrested appellant in Houston on June

3, 1975 while appellant was driving a car accompanied by a woman. When appellant exited the vehicle, Nuchia saw a pistol on the floorboard where appellant's feet would have been. The pistol was found to contain .38 cal. hollow point bullets. Appellant made bond on the instant offense in July, 1975. It was forfeited in January, 1976. On March 18, 1976, Dallas Police Officer William Hughes received a tip appellant was staying at a certain apartment in Dallas. He and other officers went to the apartment complex, got a pass key and went to the apartment. Galyean was there, but appellant was not. A trap door was discovered in the closet. Information was then received appellant was in another apartment, but he was not there. A search of an adjacent apartment revealed that a trap door there had been recently opened.

Officer William Smith responded to a call from a resident of the apartment complex about noises under her kitchen. Smith went to the apartment and heard a thumping noise in the bedroom, apparently coming from the crawl space underneath. Upon then hearing noises in the closet, Smith opened the door and saw appellant dropping a pistol into a hat box. The carpet over the trap door in the closet had been pushed back. Appellant was arrested.

Appellant called Phyllis Galyean Cantrell as a witness in his behalf. The 28-year-old witness testified she married appellant on August 29, 1973 and and divorced him on August 29, 1975, but at the time of the trial she considered herself his common-law wife. The witness, hereinafter called Galyean, testified she first met Phil Green at Wellington's, a Dallas nightclub, at the end of 1972, while she was there with Carol Greene. She related that she had dinner with Green and Carole Greene early in 1973 at Friday's; that the two were dating and since Greene was a married woman, Phil Green was given Galyean's phone number so he could contact Greene through Galyean. She said Green called her about 50 times, often asking her to visit, to have a drink and smoke marihuana, that cocaine, Tuinol and other special capsules were mentioned. Galyean stated she clashed with Green though she visited at both his apartment on Miles and later his new erotically furnished apartment on Pagewood where the alleged offense occurred. On those visits she was with Carol Greene or other friends. On the first visit Galyean admitted she smoked marihuana with Green, who later attempted to get her and Carol Greene to stand on a table and take their clothes off in the presence of out-of-state men who were also at the apartment. Green also encouraged a homosexual relationship between Galyean and Greene. After later phone calls, Galyean visited Green again with Greene or other women whom she claimed Green also dated. She visited at his new apartment on Pagewood where he had displayed a phallus symbol, in the shape of an erect male penis, pictures and other erotic art objects. On her last visit she was with Greene and her son, and they didn't smoke marihuana because of the child, but Galyean stated Green gave her some Tuinol pills to relax her and she then had several alcoholic drinks. Galyean became groggy by the time Greene left with her son and she fell asleep in front of the fireplace. She woke up in the middle of the night in Green's bed and he was having sexual intercourse with her. She got up and went home. She said that all of this time Green knew she was married. He called a number of times after the incident.

Galyean related that appellant, her husband, returned to Dallas in October, 1974, and learned she had been to Green's house on a number of occasions; that appellant, who was having a hard time financially, became jealous of Green. On the night of February 11, 1975, Galyean and appellant stayed up all night talking about their problems, and she told him the whole story, including the sexual encounter, the rape. Appellant became emotionally upset, angry and was crying. Early the next morning, she and appellant went to Green's apartment. Green came to the door and looked out. Appellant was not in position to be seen. Green opened the door for Galyean and the appellant stepped into view. Green, clad only in a towel, motioned them to enter. Galyean introduced appellant as

her husband. Appellant then accused Green of raping his wife and Green denied it. At this time appellant observed the phallus symbol and asked what it was, and Green replied, "it was none of his damn business." At this time appellant, according to Galyean, slapped Green and stated he wanted the truth. Green, holding his face, sat down in a chair and his towel fell to the floor. Appellant, in an angry voice, demanded the truth, and Green finally admitted he had drugged Galyean and had intercourse with her. Appellant became furious and began to cry. Green then stated he knew what he had done was wrong, that he wanted to make it up to both of them, that he knew they were having a hard time financially and offered to give the appellant some money. Appellant at first declined, but Green offered $5,000.00 and offered to see that Galyean got psychiatric and marriage counseling. Green then went to the kitchen to get his checkbook, and after a discussion, he convinced appellant to take the money and made out the check to Galyean because her driver's license was still in that name. Green told appellant and Galyean if he could help them in the future to let him know. Galyean then revealed they left Green's house and went to the bank and cashed the check. Galyean denied that appellant had either a gun or knife on the occasion in question, and that it was Green who had suggested money, not appellant, who had first refused the offer.

On cross-examination Galyean stated the purpose in going to Green's apartment "was to get to the truth of the matter and talk to Phil Green about it." The record then reflects:

"Q Okay. Your testimony is that there was absolutely no intent on either of your parts to go over there and commit a robbery, is that correct?

"A There was no intent for that at all."

Galyean testified appellant was convinced to take the check at Green's insistence, that appellant "was hurting from the inside out" and Green was an aggressive man.

In rebuttal the State offered, over objection, the testimony of Sherry Tinerella. She testified that on the morning of December 2 or 3, 1975, she awoke in her bedroom in Houston about 8:30 a.m. and saw appellant, whom she did not know, pointing a pistol at her. He took jewelry, gifts, cash money and other items and then stole her automobile.

It was evidence of this subsequent unadjudicated extraneous offense which appellant claims should not have been admitted.

"The general rule in all English speaking jurisdictions is that an accused person is entitled to be tried on the accusation made in the State's pleading and not on some collateral crime, or for being a criminal generally. The rule is now deemed axiomatic and is followed in all jurisdictions." *Young v. State*, 159 Tex. Cr.R. 164, 261 S.W.2d 836, 837 (1953). See also *Albrecht v. State*, 486 S.W.2d 97 (Tex.Cr.App.1972); *Cameron v. State*, 530 S.W.2d 841, 843 (Tex.Cr.App.1975); *Rubio v. State*, 607 S.W.2d 498, 499 (Tex. Cr.App.1980); *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Cr.App.1983).

The reasons for generally prohibiting the admission of extraneous offense transactions are well known:

"... In a criminal proceeding, when the State seeks admission of an extraneous or similar transaction committed by the accused which constitutes a separate criminal offense, introduction of that 'extraneous offense' transaction is inherently prejudicial, since the accused has no notice he will be called to defend against it, and his 'propensity to commit crimes' is not material to whether he is guilty of the specified conduct which is charged by the State...." *Elkins v. State*, 647 S.W.2d 663, 665 (Tex.Cr.App.1983). See also *Williams v. State*, supra; *Rubio v. State*, supra; *Bates v. State*, 643 S.W.2d 939, 944 (Tex.Cr.App.1982); *Moore v. State*, 700 S.W.2d 193, 199 (Tex.Cr.App. 1985).

■ As is true with most general rules of law, there are exceptions to the general rule of evidence that extraneous offenses

or transactions are inadmissible evidence in a criminal trial.

In *Albrecht v. State*, supra at p. 101, it was stated:

"Evidence of extraneous offenses committed by the accused has been held admissible: (1) To show the context in which the criminal act occurred.... (2) To circumstantially prove identity where the state lacks direct evidence on this issue. (3) To prove scienter, where intent or guilty knowledge is an essential element of the state's case and cannot be inferred from the act itself. (4) To prove malice or state of mind.... (5) To show the accused's motive.... (6) To refute a defensive theory raised by the accused." 486 S.W.2d at 101.

This list of exceptions set forth in *Albrecht* is not and was never intended to be an exhaustive list of exceptions to the said general rule.

In discussing the rules it has been stated:

" '[T]hese evidentiary principles, as most, must in some circumstances give way. For extraneous transactions constituting offenses shown to have been committed by the accused (note omitted) may become admissible upon a showing by the prosecution both that the transaction is *relevant* to a *material* issue in the case; and, the relevancy value of the evidence outweighs its inflammatory or prejudicial potential.' " *Elkins v. State*, 647 S.W.2d 663, 665 (Tex.Cr.App.1983), quoting *Rubio v. State*, supra at 506 (concurring opinion). (Emphasis in original opinion.)

This has been called the true test of the admissibility of extraneous offense evidence. *Williams*, supra at p. 346. See also *Plante v. State*, 692 S.W.2d 487, 491 (Tex.Cr.App.1985).

In the instant case the indictment alleged in pertinent part that appellant did

"then and there while in the course of committing theft *and with the intent to obtain and maintain control of the property* of Phillip B. Green, hereinafter called 'complainant,' the said property being Five Thousand Dollars ($5,000.00) current money of the United States of America, without the effective consent of the said complainant and *with the intent to deprive the said complainant of said property*, did then and there by using and exhibiting a deadly weapon, to wit: a handgun, knowingly and intentionally threaten and place the said complainant in fear of imminent bodily injury...."

Therefore intent was a material issue which the State was required to prove beyond a reasonable doubt. "[W]here intent or guilty knowledge is an essential element of the offense which the State must prove to obtain a conviction, its materiality goes without saying." *Morgan v. State*, 692 S.W.2d 877, 880 (Tex.Cr.App.1985).

In weighing probative value against prejudicial effect, this Court has consistently held that the State may not introduce an extraneous offense as circumstantial evidence of an element in its case-in-chief if that element can readily be inferred from other uncontested direct evidence. *Albrecht*, supra, 486 S.W.2d at 101–102; see *Robinson v. State*, 701 S.W.2d 895, 899 (Tex.Cr.App.1985); *Williams*, supra, 662 S.W.2d at 346; *Nance v. State*, 647 S.W.2d 660, 662 (Tex.Cr.App.1983); *Ruiz v. State*, 579 S.W.2d 206, 210 (Tex.Cr.App.1979). See also *Jones v. State*, 568 S.W.2d 847, 858 (Tex.Cr.App.1978).

Even if it can be argued in the instant case that appellant's intent can be inferred from the act of obtaining a check made payable to Galyean and cashed at the bank after complainant's authorization, the issue of intent was later contested by Galyean's testimony which was offered by the appellant. She expressly denied intent on the part of appellant or herself to commit robbery. Through Galyean the appellant offered the defensive theory that they went unarmed to Green's apartment to get to the truth of the matter about the "rape," and that it was Green who first suggested that he give money, that the voluntary offer was at first refused, and accepted only at Green's insistence. The State did not offer the complained of extraneous offense until rebuttal. It was not offered in the State's case-in-chief.

It was only recently observed by this Court:

> "[W]here the material issue addressed is the defendant's intent to commit the offense charged, the relevancy of the extraneous offense derives purely from the point of view of the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning namely, that an unusual and abnormal element might perhaps be present in one instant, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely, to be the true explanation of them. [ ] 2 Wigmore, Evidence, sec. 302 (Chadbourn rev. ed. (1979)" *Plante v. State*, 692 S.W.2d 487 (Tex.Cr.App. 1985).

And in *Morgan v. State*, 692 S.W.2d 877, 881 (Tex.Cr.App.1985), it was written:

> "Before an extraneous offense is admissible to negate the possibility of accident under Wigmore's doctrine of chances, such offense must be sufficiently similar in nature to the charged offense that the inference of improbability of accident logically comes into play. See Imwinkelried, Uncharged Misconduct Evidence, Secs. 5:055:10 (1984)."

■ However, the degree of similarity required is not so great where intent is the material issue as when identity is the material issue, and extraneous offenses are offered to prove modus operandi. *Morgan,* supra, footnote 6, p. 881; *Ransom v. State*, 503 S.W.2d 810 (Tex.Cr.App.1974). See also *Plante,* supra, 692 S.W.2d at 493.

■ In the instant case appellant was clearly identified and shown to be the perpetrator of the extraneous offense. Both the primary and extraneous offenses were aggravated robberies committed at private residences at approximately the same time of the morning. Both were committed at gunpoint shortly after the victim had awaken or was getting ready to go to work. There were sufficient common similar characteristics between the offenses.[1] Further, evidence of subsequent crimes may be admitted for the purpose of showing intent. *Sewell v. State*, 629 S.W.2d 42, 46 (Tex.Cr.App.1982); *Longoria v. State*, 700 S.W.2d 274 (Tex.App.—Corpus Christi 1985); *Miller v. State*, 677 S.W.2d 737 (Tex.App.—Corpus Christi 1984). We do not find that an extraneous offense occurring some eight to nine months after the instant offense was too remote. "The factors of remoteness and similarity are important, not in and of themselves, but only as they bear on the relevancy and probative value of the offered extraneous offenses." *Plante v. State*, supra, 692 S.W.2d at 491.

■ Extraneous transactions must be analyzed for relevance within the contexts of facts and circumstances of the individual case in order to determine admissibility. *Brandley v. State*, 691 S.W.2d 699 (Tex.Cr.App.1985). Each case must be determined on its own merits. *Lombardo v. State*, 503 S.W.2d 780 (Tex.Cr.App.1974). And the trial judge's discretion in admitting an extraneous offense is to be given due deference.

In *United States v. Wilson*, 732 F.2d 404, 407 (5th Cir.1984), cert. den., 469 U.S. 1099, 105 S.Ct. 609, 83 L.Ed.2d 718, it was held that an extraneous offense was admissible on the issue of intent particularly in light of the fact the defendant sought to justify his acts by claiming he had no intent to commit the charged charge.

■ In *Avilla v. State*, 493 S.W.2d 233, 235 (Tex.Cr.App.1973), this Court wrote:

> "In the instant case, appellant admitted taking the items in question but

---

**1.** The mere fact that certain dissimilarities are present between the extraneous offense and the offense for which the accused is on trial does not make the extraneous offense inadmissible if the accused is clearly identified and shown to be the perpetrator of the extraneous offense. *Lewis v. State*, 674 S.W.2d 423 (Tex.App.—Dallas 1984, PDR ref'd.).

claimed that he did not intend to rob either Ballard or Mullins, and that the items were given to him. Thus, appellant's intent at the time he took the items became a contested issue in the case. Since proof of the extraneous offense was relevant and material to the question of appellant's intent concerning the offense for which he was being tried, the evidence of the extraneous offenses were admissible for that purpose. See, e.g., *Grayson v. State*, Tex.Cr.App., 481 S.W.2d 859, and cases cited therein." See and cf. *Williams v. State*, 575 S.W.2d 30 (Tex.Cr.App.1979).[2]

 In the instant case appellant contested the issue of intent by defensive testimony and offered the defensive theory that the check in question was given to him and he had no intent to rob Green. Under the circumstances the probative value of the evidence outweighed its potential prejudicial effect. The point of error is overruled.

 In his second point of error appellant charged the court erred in allowing the State to prove that he had been in the penitentiary.

On direct examination Green testified that after Galyean had made a number of visits to his apartment she called him in October, 1974, and stated she was going to marry a man named Herman. As a result of the conversation, he learned where Herman was, but he did not testify where. On cross-examination defense counsel returned to the conversation in an attempt to show that Green knew that Galyean was already married, not getting married. After a hearing in the absence of the jury, the court ruled that the State could go into the balance of the conversation. See Article 38.24, V.A.C.C.P. On redirect examination Green was asked what Galyean had told him in the said conversation. He replied she had "called excited and told me that she was getting married. She was getting married in the City of Huntsville to a man

in prison ... that this was the first time that this had taken place in the State of Texas, a man in prison was married in prison, and she was very excited about it."

The State had first broached the subject of the telephone conversation in showing the last contact between Galyean and Green before the alleged offense. Appellant sought to use the conversation to show that Green knew all along that she was married and did not have any belief she was just getting ready to be married. After that the State sought to clarify just how Green's belief was formulated. See Article 38.24, supra.

On cross-examination of Officer Stanley McNeer appellant sought to establish by questions whether McNeer had been told by Green whether Green knew Galyean was married or was getting married to a man in prison at the time of the termination of their relationship.

On redirect examination of Officer Nuchia, who arrested appellant in Houston for the instant offense, it was established without objection that appellant had told Nuchia he had been shot but he had killed the person who shot him.

On cross-examination Galyean testified, without objection, that her driver's license was in the name of Galyean rather than Cantrell as "Herman had a record" and in discussing the belt she wore with her blue-jeans when visiting Green, she related she got it as a 1973 Christmas present because "it is very hard to get something like that made in prison, and sent to your wife."

On both direct and cross-examination Galyean testified appellant had served 20 months in the penitentiary, and further on cross-examination she stated he was in the penitentiary for multiple charges, murder without malice, two assault to murder cases and two drug cases, that he made state approved trustee, and volunteered that theirs was "the first marriage ever in the Texas Prisons" and that Clyde White-

**2.** As earlier noted, evidence of an extraneous offense is admissible to refute a defensive theory raised by the accused. *Wintters v. State*, 616 S.W.2d 197, 200 (Tex.Cr.App.1981); *Ransom v. State*, 503 S.W.2d 810, 814 (Tex.Cr.App.1974); *Carter v. State*, 668 S.W.2d 851 (Tex.App.—San Antonio 1984—PDR ref'd.); *Clayton v. State*, 653 S.W.2d 887 (Tex.App.—Corpus Christi 1983).

side of the Parole Board told her she should always be proud of that.

Even if the complained of evidence was improperly admitted under Article 38.24, V.A.C.C.P., the admission was harmless in light of all the other evidence adduced on direct or on cross-examination without objection. The point of error is overruled.

In his third point of error appellant again complains that the court erred in allowing evidence that he was in prison. This time we are directed to the cross-examination of Galyean not mentioned above. As a result of the conflict in the marital status of Galyean at the time of her visits to Green's apartments, she was asked on cross-examination "where" she had married the appellant. The appellant objected it was an attempt to get extraneous matters into evidence. The objection was overruled. Galyean responded, "I married Herman Cantrell in Prison." The State now argues the question itself was not objectionable and could have been answered without implying an extraneous offense. The State also points out that immediately thereafter Galyean went on to answer other questions about the appellant being in prison without further objection. In light of all the other similar evidence admitted and discussed previously, this renders the error, if any, harmless. The point of error is overruled.

In two points of error appellant contends that the trial court erred in allowing the State to prove he had a pistol in his possession when first arrested, and in proving he also had a pistol when arrested the second time.

Over a month after the alleged offense the complainant Green identified appellant's picture from a photographic spread. Efforts made to locate and apprehend appellant in the Dallas area were unsuccessful. Eventually Officer McNeer learned appellant was in Houston and sent an arrest warrant there on June 3, 1975. Houston Police Officer Nuchia set up a surveillance at a gas station where the woman with whom appellant was reportedly staying worked. Appellant arrived at the station, let a woman out of the car he was driving, but then eluded the officers who tried to follow him. Later in the day another surveillance was established to watch the car appellant had been seen driving. Appellant was seen leaving an apartment with a woman. As they drove away Nuchia and other officers signaled appellant to stop and told him to get out of the car. As appellant got out, Nuchia saw in plain view a pistol on the floorboard of the car where appellant's right foot would have been. The pistol was found to contain .38 cal. hollow point bullets. The pistol was identified by the complainant Green as being the handgun or appearing to be the handgun used in the alleged robbery offense.

Flight is a circumstance from which guilt may be inferred. *Arivette v. State,* 513 S.W.2d 857 (Tex.Cr.App.1974); *Whittington v. State,* 580 S.W.2d 845, 846 (Tex.Cr.App.1979). Consequently, evidence of flight is admissible even though it may show the commission of other crimes. *Arivette v. State,* supra; *Whittington v. State,* supra; *Thompson v. State,* 652 S.W.2d 770 (Tex.Cr.App.1983). Such evidence is also relevant to show efforts made to locate or apprehend a defendant, his pursuit and capture, circumstances of his arrest including his resistance. *Whittington v. Estelle,* 704 F.2d 1418 (5th Cir.1983), cert. den., 464 U.S. 983, 104 S.Ct. 428, 78 L.Ed.2d 361 (1983); *Thompson v. State,* supra; *McWherter v. State,* 607 S.W.2d 531 (Tex.Cr.App.1980); *Whittington v. State,* 580 S.W.2d 845 (Tex.Cr.App.1979). See also *Martinez v. State,* 140 Tex.Cr.R. 159, 140 S.W.2d 187 (1939); *Jones v. State,* 471 S.W.2d 413 (Tex.Cr.App.1971).

Putting aside the question of whether the seizure of the pistol at the time of appellant's first arrest was admissible in connection with evidence of flight, we observe that only recently this Court, speaking through Judge Campbell, stated in *Maddox v. State,* 682 S.W.2d 563, 564 (Tex. Cr.App.1985):

"The general rule in Texas is that the State is entitled to show circumstances surrounding arrest. *Williams v. State,* 535 S.W.2d 637 (Tex.Cr.App.1976); *Hernandez v. State,* 484 S.W.2d 754 (Tex.Cr. App.1972); *Jones v. State,* 471 S.W.2d

413 (Tex.Cr.App.1971). However, when such evidence is 'inherently prejudicial and has no relevance to any issue in the case,' then the general rule no longer applies, and the evidence becomes inadmissible. *Hernandez,* supra; *Powell v. State,* 478 S.W.2d 95 (Tex.Cr.App.1971). In reviewing questions of this sort, we are constrained to pass on claimed error by determining only whether the trial judge *clearly* abused his discretion in allowing the evidence to be admitted. *Hernandez,* supra; *Lanham v. State,* 474 S.W.2d 197 (Tex.Cr.App.1971)." (Footnote omitted.)

It is observed that in *Jones v. State,* supra, that the defendant was arrested for robbery more than two months after the crime. The vehicle he was driving when arrested was determined to have been "hot wired." There this Court held there was no error in admitting this evidence as circumstances surrounding the arrest.

 Since the evidence seized was identified as the pistol used in the alleged offense, the general rule prevails, and we hold that the State was entitled to show the circumstances surrounding the first arrest of appellant.

In view of our holding, we need not reach the question of the application of the doctrine of curative admissibility. Appellant offered the testimony of Sue Renteria, the woman in the car with appellant, who claimed ownership of the pistol in question, having obtained it from Galyean in January preceding the alleged February 12th robbery. She expounded on the circumstances of the arrest.

 The record shows that appellant made a bail bond in the instant case in July, 1975, and was released. The evidence also shows that in January, 1976, the bond was forfeited. The forfeiture of an accused's bail bond may be proved as tending to show flight. *Tindall v. State,* 146 Tex. Cr.R. 245, 172 S.W.2d 328 (1943); *Guajardo v. State,* 378 S.W.2d 853 (Tex.Cr.App. 1964); *Walker v. State,* 441 S.W.2d 201 (Tex.Cr.App.1969); *Logan v. State,* 510 S.W.2d 598 (Tex.Cr.App.1974). And flight, in the context of bail-jumping, may be construed as evidence of guilt. *Wockenfuss v. State,* 521 S.W.2d 630 (Tex.Cr.App.1975). See also *Bogert v. State,* 681 S.W.2d 822 (Tex.App.—Houston [14th Dist.] 1984).

After the forfeiture of bail, Dallas Police Officer Hughes on March 18, 1976, received a tip via a telephone call that appellant was in a certain Dallas apartment. Upon arriving at said apartment, the officers found Galyean there, but appellant was not there. They did discover a trap door in one of the closets leading to a crawl space underneath the various apartments. While still at the apartment complex, Officer William Smith responded to a call from a resident of another apartment that she had heard noises under her kitchen. When Smith arrived, he heard noises under the bedroom, and then in the closet. Opening the closet, he saw appellant, who was dropping a pistol in a hat box. The trap door had been pushed back. Smith ordered appellant out of the closet and observed a loaded clip in his left hand. As Smith reached for the clip, appellant began fighting. He was eventually subdued and handcuffed.

 In light of the cases discussed above authorizing evidence of flight and permitting the showing of the circumstances surrounding the arrest of a defendant, we conclude that there was no error in the trial court admitting evidence that during appellant's second arrest a pistol was found in his possession.

In disposing of points of error Nos. four and five, we find no necessity of discussing the State's contention that the objections "object to him going into extraneous matters" and "... object to this man testifying as to extraneous matters" were belated and too general to preserve error as to the introduction of the pistols found at the time of the first and second arrest.

Appellant also contends the court erred in restricting his voir dire examination of prospective juror Morgan by refusing to allow him to determine if Morgan would be prejudiced in favor of a State's witness, and if Morgan was in fact a friend of a State's witness.

During the voir dire examination of the jury panel appellant's counsel read a list of State's witnesses and asked the panel if any of them knew any of the named witnesses, including "W.A. Smith," a police officer. A Mrs. Morgan responded that she might know Smith, that a teaching friend of hers had a husband named "Bill Smith," who was a Dallas police officer and that he was "Well, yeah, a friend." In response to the court's questions, she stated she did not know if the "W.A. Smith" listed as a witness was the Bill Smith she knew. Morgan admitted to appellant's counsel that based on her relationship with the Bill Smith and his wife she would find him a more believable witness than others if Bill Smith was in fact "W.A. Smith" listed as a witness. Morgan stated, "Well, I would believe that he would not get on the witness stand and not tell the truth." Appellant's challenge for cause was denied. Appellant's motion, then made, to bring the listed witness before the prospective juror for possible identification was also denied. There is nothing to show that the witness listed was available at the time of the motion.

Appellant complains that he was forced to use a *peremptory challenge without being given* the opportunity to make a knowing choice. If appellant exhausted his peremptory challenges and was forced to take an unacceptable juror due to any error in overruling his challenge for cause to Morgan, he does not point out where in the record evidence of these facts can be found.

■ The State takes the position that if there was error in overruling the challenge for cause the appellant does not allege and the record does not show that he asked for any additional peremptory challenges or that the court would not have given an additional challenge if such request had been made, and that nothing is presented for review. *Adami v. State*, 524 S.W.2d 693, 700 (Tex.Cr.App.1975); *Peters v. State*, 575 S.W.2d 560 (Tex.Cr.App.1979). The State is right. Appellant's points of error are overruled.

Next, appellant urges that the trial court erred in refusing under *Gaskin v. State* to let his counsel inspect a statement given to the police by State's witness Sherri Tinerella. The contention is without merit.

■ Tinerella testified as to the extraneous robbery offense in Houston on December 2 or 3, 1975. She later testified that when she talked to police officers in Houston they made some notes. She did not testify that she had made and signed a statement. And it was the police officers' notes, not the witness' statement, that were requested by counsel at the time of the witness' testimony. The request for notes was denied. It is clear that *Gaskin v. State*, 172 Tex.Cr.R. 7, 353 S.W.2d 467 (1962), which is limited in application to the inspection of a previous statement or report made by the witness testifying for the State, is not here controlling. The work product or notes of the Houston police officers were later sealed by the court and ordered attached to the record as court exhibit No. one. The appellate record does not appear to contain such notes, and appellant does not point out where such notes may be found in such record. We find no objection by appellant to the failure to include such notes. The responsibility for getting such notes before this Court belonged to the appellant. See and cf. *Gilbreath v. State*, 500 S.W.2d 527 (Tex.Cr. App.1973).

■ Appellant further contends the trial court erred in failing to limit the consideration by the jury of the testimony that he had been convicted of other offenses. Appellant refers to evidence that he was in prison prior to the robbery offense charged. He claims he timely submitted a requested limiting charge which was refused. The charge requested asked the jury be instructed that evidence that appellant had been *charged and convicted* of offenses could not be considered as any evidence of guilt, and was admitted "for the purpose of aiding you, if it does aid you, in considering the state of mind of Phillip B. Green only, and you will not consider the same for any other purpose."

There is no showing that the evidence was solely admitted for the purpose claimed by appellant or that appellant was entitled to the jury instruction requested. Appellant cites only *Lanham v. State*, 99 Tex.Cr.R. 410, 269 S.W. 799 (1925), which does not support his requested charge. The trial court did not err in refusing the requested charge.

Appellant further urges the trial court erred in refusing to restrict the jury's consideration of an extrajudicial confession made by Galyean to a police officer.

Galyean, who testified she was appellant's wife and was a co-defendant, stated that she and appellant went to Green's house "to get to the truth of the matter" and that Green was not forced to give them money. She testified appellant was unarmed and had neither a gun nor a knife.

The State offered testimony of a police officer (McNeer) that while Galyean was on bond as a result of the instant offense she told him that at the time of the offense appellant had both a gun and knife and had forced her to accompany him to Green's house. It is obvious that the State offered the evidence to impeach Galyean's earlier testimony.

Appellant claims that it is well established that the confession of one defendant may not be used against another defendant. *Carey v. State*, 455 S.W.2d 217 (Tex.Cr.App.1970), and that limiting jury instructions may not cure the harm. *Evans v. State*, 534 S.W.2d 707 (Tex.Cr.App.1976). Appellant timely requested a limiting instruction that Galyean's statement to Officer McNeer was not to be used "as any evidence against" him or used in any way to connect him to the alleged offense. The special requested charge was refused, and appellant claims this was error.

The State takes the position that the statement to McNeer did not constitute a confession as nothing said inculpates her, nor did the statements reflect an admission of guilt on the part of appellant by Galyean. She was quoted only as saying appellant forced her to go to Green's house and he had a gun and a knife at the time. We agree with the State that McNeer's testimony was offered only to impeach Galyean's testimony to the contrary.

Appellant calls attention to the "general rule" set forth in *Winfrey v. State*, 41 Tex.Cr.R. 538, 56 S.W. 919 (1900), where it was stated:

"Where it is apparent that the testimony can be used for no other purpose than that of impeachment, it is not necessary for the court to limit the purpose of the same in its charge. If it could be used otherwise, either as an incriminating fact, or to exercise a strong, undue, or improper influence upon the jury as to the main issue, injurious and prejudicial to appellant, then it would have been the duty of the court to limit and restrict its effect in his charge so that no unwarranted results could ensue."

See also *Ballard v. State*, 464 S.W.2d 861 (Tex.Cr.App.1971).

■ It is well established that where testimony in question could only be used by the jury for impeachment, no limiting charge to the jury is required, *Minor v. State*, 476 S.W.2d 694 (Tex.Cr.App.1972); *Wiley v. State*, 153 Tex.Cr.R. 370, 220 S.W.2d 172 (1949). And no limiting charge is required if the testimony could have been admitted for both impeachment purposes and as direct evidence. See *McCarter v. State*, 478 S.W.2d 524 (Tex.Cr.App. 1972); Article 36.14, V.A.C.C.P., note 427. See and cf. *Bush v. State*, 642 S.W.2d 787 (Tex.Cr.App.1982).

■ The "general rule" relied upon by appellant would require at most an instruction limiting the testimony for the purposes of impeachment only. Appellant did not object on this basis nor was his special requested charge so designed. See *Bush v. State*, supra. It was and is appellant's contention that McNeer's testimony reflected a "confession" on the part of Galyean and that such testimony could not be used against appellant and such "confession" should be limited in the court's charge.

The point of error is overruled.

Lastly, appellant contends the conviction should be reversed because he was tried as

a criminal generally and denied his right to a tolerably fair trial.

This is a cumulative error argument. He cites *Brown v. State*, 168 Tex.Cr.R. 67, 323 S.W.2d 954 (1959), and *Harrison v. State*, 491 S.W.2d 920 (Tex.Cr.App.1973), to support his claim "to at least one tolerably fair trial," and claims that since the record was replete with evidence of extraneous and collateral criminal acts on his part offered by the State, he had been denied a fair trial.

He candidly admits the matters referred to have been complained about in other points of error. We have disposed of those points of error and decline to reverse the conviction on the basis of cumulative error. The point of error is overruled.

The judgment is affirmed.

CLINTON, MILLER and CAMPBELL, JJ., dissent.

TEAGUE, J., dissents to disposition of points of error 1, 6 and 7.