**Affirmed as Modified and Opinion Filed April 17, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-13-01586-CR

**SYLVIA ROMERO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause No. F-01-16575-X**

## OPINION

Before Justices Lang and Brown[1]
Opinion by Justice Lang

Sylvia Romero appeals the trial court's judgment convicting her of injury to a child. The jury found Romero guilty and assessed her punishment at life imprisonment and a $10,000 fine. Romero raises two issues on appeal arguing: (1) the evidence is legally insufficient to support her conviction; and (2) she suffered egregious harm when the trial court included an instruction in the jury charge that authorized the jury to convict her of injury to a child under an incorrect definition of the culpable mental state. The State raises one issue on cross-appeal arguing the judgment should be modified to reflect the correct statute for the offense.

We conclude the evidence is sufficient to support Romero's conviction. Also, we conclude that, even though the trial court included an instruction in the jury charge that

---

[1] The Hon. Kerry P. FitzGerald was on the panel and participated at the submission of this case. Due to his retirement from this Court on December 31, 2014, he did not participate in the issuance of this opinion. *See* TEX. R. APP. P. 41.1 (a), (b).

authorized the jury to convict Romero of injury to a child if they found that she intentionally "engage[d] in the conduct," Romero has not shown that she suffered egregious harm. Further, we conclude the judgment lists an incorrect statute for the offense and fails to list that Romero used a deadly weapon, and modify the judgment accordingly. The trial court's judgment is affirmed as modified.

## I. FACTUAL AND PROCEDURAL BACKGROUND

M.I. was born in Mexico and her mother abandoned her approximately three months after she was born. Afterward, M.I.'s father, Silvio Iniesta, relocated to the United States where he met and married Romero. Iniesta and Romero also had a child together, A.K. The children were approximately one year apart in age. Iniesta worked as a long-haul truck driver and was away from home most of the time while Romero cared for the children.

Alexamari Villareal, Iniesto's sister, visited Romero "at least two times a week." Villareal observed that Romero did not treat the children equally. Villareal believed Romero showed a preference for A.K., and was stricter with and yelled at M.I. Although Villareal did not see Romero physically abuse M.I., she did see Romero treat M.I. roughly. Villareal saw M.I. cry a lot, observed that M.I. was unhappy and sad, and knew that M.I.'s arm was always in pain.

On May 18, 2001, M.I. was taken to the emergency room. Medical imaging revealed an uncommon fracture of M.I.'s humerus bone at the shoulder joint. Also, the imaging revealed that the fracture was several weeks old based on the degree of healing.

On September 9, 2001, Villareal picked her daughter up from Romero's apartment. M.I., who was two years old at the time, grabbed her shoes and wanted to leave with Villareal. Villareal told Romero to tell M.I. "to get ready and go to [Villareal's] house," but Romero said, "No." M.I. started crying. Approximately fifteen minutes after Villareal left Romero's

apartment, she received a "missed call" from Romero.  Later, when Villareal saw the missed call, she tried to return Romero's call, but there was no answer.

Meanwhile, on September 9, 2001, Romero called 9-1-1, reporting to the dispatcher that M.I. had fallen off of a couch while jumping and hit her head.  When the emergency medical technicians (EMTs) arrived at Romero's apartment, they saw Romero and A.K., and found M.I. lying on the dining room floor carpet.  M.I. was unresponsive, had a "blown pupil," and her body was posturing, which is an abnormal motor function.  These signs were indicative of a brain injury, so the EMTs immediately took M.I. in the ambulance to the hospital where a medical team was waiting for her.

Pamela Okada, M.D., was waiting for M.I. when she arrived at the hospital and was the first emergency room physician to examine her.  Dr. Okada was informed that M.I. had fallen off the couch on either the carpet or "a chimney" and the step-mother had stated she was not in the room when it happened.  Dr. Okada found that M.I. was nonresponsive, i.e., she had no eye movement and did not open her eyes spontaneously, and she made no verbal response, spoke no words, and did not cry.  She also found that M.I.'s arms were posturing, which is a serious abnormal motor function that shows the body is unable to follow commands.  In addition, Dr. Okada found that M.I. had a "blown pupil" or a pupil that is dilated large, which is indicative of brain swelling or something pushing on the brain.  Dr. Okada ordered CAT Scans and blood tests.  The imaging revealed a large skull fracture and subdural hematoma, a serious brain injury, and that her pancreas was lacerated or torn into two pieces.  As a result, M.I. was intubated, i.e., a breathing tube was put into M.I.'s lungs, and provided oxygen.

Dale Swift, M.D., a pediatric neurosurgeon, operated on M.I.  Dr. Swift found fresh subdural and epidural hematomas and one long segmented skull fracture that appeared to be a couple of weeks old based on the degree of healing.  To alleviate the bleeding and swelling, Dr.

Swift performed a craniotomy, cutting open M.I.'s scalp, drilling a hole in her skull, and removing a large window of bone. Then, M.I. was placed in a pentobarbital coma.

At the hospital, Romero told JoAnne Marchant of Child Protective Services (CPS) that she was in the bathroom when she heard a child scream, "Mamma," and the sound of a fall. Romero stated that she believed A.K. had fallen, but instead found M.I. lying on her back by the fireplace and unconscious. Romero stated that M.I. was in the habit of playing on and jumping from the rocking chair to the fireplace and she believed the rocking chair had fallen over. Also, Romero explained that M.I. broke her arm when she fell off of the bed while playing with a cousin who had wrapped M.I. in a bed sheet. Romero and Marchant drew a diagram of the scene and Romero provided a handwritten affidavit in Spanish, which was translated into English as follows:

> Silvia Romero affirms that [M.I.] was playing with her daughter and was in the bathroom when I suddenly heard a scream. I thought that the child [A.K.] had fallen, but it wasn't so.
>
> I found [M.I.] tossed in the middle of the chimney. I picked her up and wet her head with water. And she wasn't breathing very well but her aunt [Villareal] had just left and I called [Villareal] on her cellular and she didn't answer.
>
> Then[,] I dialed 911 and then they tended to the child and they asked me where she had fallen from and I told them from the couch. That is, the rocking chair. I wasn't asked anything else, nothing else, and I am at the clinic.

That night, CPS removed A.K. from Romero's home. Then, CPS proceeded to terminate Romero's parental rights to A.K. After M.I. was released from the hospital, she went through a series of foster homes for approximately a year before she returned to Mexico.

On September 13, 2001, during an interview with the Carrollton police, Romero made a second, voluntary statement to Detectives Vick Humphrey and Jose Flores. The statement was provided in Spanish and was translated into English as follows:

This Sunday [I] was in my apartment with my daughters, [M.I.], [A.K.,] and [Villareal's daughter]. Around 4:00 p.m., my sister-in-law came to my apartment too.

So then we ate and stayed for about five minutes and [Villareal] took [Villareal's daughter]. My daughters and I were watching television. My daughter was playing with the control.

So then I told her, "Calm down, because if you don't, I'm going to spank you." And she wouldn't calm down.

I got really annoyed and grabbed my girl's arm and I pushed her hard on the chair and the chair went backwards and she hit her head on the floor.

She did not react and I took her to the bathroom and I wet her head and she didn't react and I gave her moth-to-mouth resuscitation and nothing.

And then I called 911. That was when they came and tended to her and I went with them. I am sorry about what happened. I am torn because this was an accident and I am so regretful and it hurt me a lot.

Romero was arrested in September 2001, indicted for the offense of injury to a child, and released on bond in March 2002. After being released on bond, Romero fled to Mexico. The case was called for trial on December 9, 2002, but Romero failed to appear and answer. On December 11, 2002, Dallas County Criminal District Court No. 4 signed a judgment nisi against Romero. Romero lived in Mexico for approximately three years before moving to North Carolina with her siblings. Romero was re-arrested in September 2011.

In September 2013, Romero was tried before a jury. During the trial, Villareal testified that at the time of trial, M.I. was fifteen years old and living in Mexico with Iniesta. Villareal also stated that M.I. is unable to talk or feed herself, walks with difficulty, can move only one hand and one eye, and wears a diaper. Dr. Okada, Dr. Swift, and Mathew Cox, M.D., a pediatrician who reviewed M.I.'s medical files, provided medical testimony regarding the nature and extent of M.I.'s injuries during the trial. Romero testified in her own defense and denied harming M.I., stating that she was not in the room at the time of M.I.'s injury and did not know

how M.I.'s injuries occurred. The jury found Romero guilty of injury to child. After a hearing on punishment, the jury assessed Romero's punishment at life imprisonment and a $10,000 fine.

## II. SUFFICIENCY OF THE EVIDENCE

In issue one, Romero argues the evidence is insufficient to support her conviction. Romero contends there is no evidence she intended to cause the injuries resulting from her actions. In the alternative, she argues the evidence shows only that she was guilty of the lesser included offense of recklessly causing the injury. The State responds that the overwhelming evidence allowed a rational jury to find Romero guilty of intentionally or knowingly causing serious bodily injury to a child.

### A. *Standard of Review*

When reviewing the sufficiency of the evidence, an appellate court considers all of the evidence in the light most favorable to the verdict to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.). Appellate courts are required to determine whether any rational juror could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 902 n.19. An appellate court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See Jackson*, 443 U.S. at 319, 326; *Merritt*, 368 S.W.3d at 525; *Brooks*, 323 S.W.3d at 899. All evidence, whether properly or improperly admitted, will be considered when reviewing the sufficiency of the evidence. *See McDaniel v. Brown*, 558 U.S. 120 (2010) (per curiam); *Lockhart v. Nelson*, 488 U.S. 33, 41–42 (1988); *Jackson*, 443 U.S. at 319.

## B. Applicable Law

Section 22.04(a)(1) of the Texas Penal Code states that "[a] person commits [the offense of injury to a child] if he intentionally, knowingly, recklessly, or with criminal negligence, by act . . . causes to a child . . . serious bodily injury." TEX. PENAL CODE ANN. § 22.04(a)(1) (West Supp. 2014). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE ANN. § 6.03(a) (West 2011). A person acts knowingly with respect to a result of his conduct when he is aware his conduct is reasonably likely to cause the result. TEX. PENAL CODE ANN. § 6.03(b).

The culpable mental state is generally proven by circumstantial evidence. *Lopez v. State*, 630 S.W.2d 936, 942 (Tex. Crim. App. [Panel Op.] 1982); *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978). To determine culpability for an offense, a jury is entitled to consider events before, during, and after the commission of the offense. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); *Barron v. State*, 566 S.W.2d 929, 931 (Tex. Crim. App. [Panel Op.] 1982). Proof of a culpable mental state may be inferred from any facts tending to prove its existence, including the acts, words, and conduct of the accused. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). It may also be inferred from the extent of the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (citing *Lindsey v. State*, 501 S.W.2d 647, 648 (Tex. Crim. App. 1973)). Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations are probative of wrongful conduct and also circumstances of guilt. *Guevara*, 152 S.W.3d at 50. Also, Texas law has long recognized that evidence of a defendant's flight or escape is a circumstance from which an inference of guilt may be drawn. *See e.g., Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994); *Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994); *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989); *Cantrell v.*

*State*, 731 S.W.2d 84, 92 (Tex. Crim. App. 1987); *Rumbaugh v. State*, 629 S.W.2d 747, 752 (Tex. Crim. App. 1982); *McWherter v. State*, 607 S.W.2d 531, 535 (Tex. Crim. App. 1980).

### C. Application of the Law to the Facts

The record shows that M.I. suffered serious bodily injury. The EMTs and Dr. Okada found that M.I. was nonresponsive, posturing, and had a "blown pupil." Medical imaging revealed that M.I. had a large skull fracture and subdural hematoma, and her pancreas was lacerated or torn into two pieces. Dr. Swift performed a craniotomy and found that M.I. had fresh subdural and epidural hematomas and one long segmented skull fracture that appeared to be a couple of weeks old based on the degree of healing. As a result of her injuries, M.I. had to be placed in a pentobarbital coma. Further, Villareal testified that, at the time of trial, M.I. was fifteen years old, and as a result of her injuries, M.I. remains unable to talk or feed herself, walks with difficulty, is unable to move one hand and one eye, and wears a diaper. The jury could infer that Romero intentionally or knowingly injured M.I. from the extent of M.I.'s injuries. *See Patrick*, 906 S.W.2d at 487 (culpable mental state can be inferred from extent of injuries).

The record shows Villareal left Romero's apartment approximately fifteen minutes before M.I. was injured. As a result, Romero and A.K. were the only persons present in the apartment at the time M.I. was injured. M.I. was two years old and A.K. was one year old. The evidence of M.I.'s age and size compared with that of Romero, who the jury was able to see in court, is a circumstance from which the jury could infer that Romero intentionally or knowingly injured M.I. *See Patrick*, 906 S.W.2d at 487 (culpable mental state can be inferred from relative size and strength of parties).

When asked about M.I.'s injuries, Romero gave inconsistent statements. First, she told the 9-1-1 dispatcher that M.I. had fallen off of a couch while jumping and hit her head. Then, she told CPS that while she was in the bathroom, she heard a child scream and found M.I. lying

on her back by the fireplace and unconscious. Romero stated that she believed while M.I. was playing on and jumping from the rocking chair to the fireplace, the rocking chair had fallen over. Next, Romero gave police a voluntary written statement admitting that she pushed M.I. At trial, Romero claimed that she was not in the room when M.I. was injured.

In addition, Dr. Okada and Dr. Swift, the treating physicians, and Dr. Cox, the medical expert at trial, testified that in their opinions M.I.'s injuries were not consistent with Romero's explanation and were the result of non-accidental trauma. Dr. Swift testified that, in his opinion, based on the types of injuries sustained a person would have known that they were going to cause bodily injury to the child. Dr. Cox testified that his review of M.I.'s medical file showed there has been more than one episode of trauma to M.I., which are not explained by the history that was provided by Romero, indicating that her injuries were inflicted and the result of child abuse. Also, Dr. Cox stated that "based on the type of injuries, it would be obvious to the person there that what happened would be injurious." Dr. Cox stated that M.I.'s injuries required "high force." Romero's inconsistent statements to the 9-1-1 dispatcher, CPS workers, and the police, and implausible explanations for M.I.'s injuries are circumstances from which the jury could infer Romero's consciousness of guilt. *See Guevara*, 152 S.W.3d at 50 (inconsistent statements and implausible explanations are circumstances of guilt).

Romero was arrested in September 2001, indicted for the offense of injury to a child, and released on bond in March 2002. Romero testified that, although she does not speak English and the judge did not speak Spanish, she understood the trial judge to say, during her March 26, 2002 hearing, that she could just go home and never had to return to court. After that hearing, Villareal picked Romero up from the jail and Romero stayed with her for approximately four months. Then, Romero stated that she went to Mexico because her husband's father died, her husband was supporting her, she did not work, and she was pregnant. However, Villareal

testified that, when Romero left Villareal's home for Mexico, Villareal asked Romero "how she gets free from jail," and Romero told her "she got a call and the Judge tell her just go home." Romero stated she lived in Mexico for three years before moving to North Carolina with her siblings. Romero was re-arrested nine years later in September 2011. The evidence of Romero's flight from prosecution is a circumstance from which the jury could infer Romero's consciousness of guilt. *See e.g., Bigby*, 892 S.W.2d at 883; *Burks*, 876 S.W.2d at 903; *Cantrell*, 731 S.W.2d at 92; *Foster*, 779 S.W.2d at 859; *Rumbaugh*, 629 S.W.2d at 752; *McWherter*, 607 S.W.2d at 535.

Reviewing all of the evidence in the light most favorable to the jury's verdict, we conclude a rational jury could have found that Romero intentionally or knowingly caused injury to M.I., a child. *See Jackson*, 443 U.S. at 318–19; *Brooks*, 323 S.W.3d at 899. Issue one is decided against Romero.

### III. JURY CHARGE ERROR

In issue two, Romero argues that she suffered egregious harm when the trial court included an instruction in the jury charge that authorized the jury to convict her of injury to a child if they found that she "intentionally" engaged in the conduct. She claims that the trial court incorrectly defined "intentionally" and that error was egregious because the jury could have found her guilty of intentionally engaging in the alleged conduct based upon that incorrect definition. Romero concedes that the portion of the jury charge containing the definitions of knowingly and recklessly were correct. Finally, Romero acknowledges that no objection was raised at trial respecting the definition of "intentionally."

The State "agrees [] that the definition of 'intentionally' should not have included the phrase 'engage in the conduct or.'" However, the State argues that Romero did not suffer egregious harm because the application paragraphs show the trial court correctly limited the

–10–

culpable mental states to the result of Romero's conduct. Also, the State contends that the jury returned a general verdict of guilty of "intentionally or knowingly causing serious bodily injury as charged in the indictment," so the jury could have found that Romero knowingly caused bodily injury to M.I.

## A. Egregious Harm

Article 36.19 of the Texas Code of Criminal Procedure establishes the standard for reversal on appeal when the requirements of article 36.14, which relates to the charge of the court, have been disregarded: "the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of [the] defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial." TEX. CODE CRIM. PROC. ANN. art. art. 36.19 (West 2006). Under *Almanza*, jury charge error requires reversal of the judgment when the defendant has properly objected to the charge and the appellate court finds "some harm" to his rights. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). When the defendant fails to object or states that he has no objection to the jury charge, an appellate court will not reverse for jury charge error unless the record shows "egregious harm" to the defendant. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005).

Egregious harm is a difficult standard to prove and such a determination must be done on a case-by-case basis. *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011); *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). The actual degree of harm must be assayed in light of: (1) the entire jury charge; (2) the state of the evidence; (3) the argument of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); *Almanza*, 686 S.W.2d at 171. Errors which result in egregious harm are those that affect the very basis of the case, deprive the defendant of

–11–

a valuable right, vitally affect the defensive theory, or make a case for conviction clearly and significantly more persuasive. *E.g., Taylor*, 332 S.W.3d at 490.

### B. Application of the Law to the Facts

First, we examine the entire jury charge. *See Allen*, 253 S.W.3d at 264; *Almanza*, 686 S.W.2d at 171. Section 22.04(a)(1) of the Texas Penal Code states that "[a] person commits [the offense of injury to a child] if he intentionally, knowingly, recklessly, or with criminal negligence, by act . . . causes to a child . . . serious bodily injury." TEX. PENAL CODE ANN. § 22.04(a)(1). The definition portion of the jury charge states,

> A person acts intentionally, or with intent, with respect to [] a result of his conduct when it is his conscious objective or desire to **engage in the conduct or** cause the result.

> A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

(Emphasis added). The application paragraphs of the jury charge state:

> Now if you find from the evidence beyond a reasonable doubt that on or about the 9th day of September, 2001, in Dallas County, Texas, the defendant, Silvia Romero, did then and there knowingly or intentionally cause serious bodily injury to [M.I.], a child fourteen years of age or younger, hereinafter called complainant, by throwing or pushing complainant into a chair with her hands, a deadly weapon, or causing complainant to strike the floor, a deadly weapon, or a fireplace, a deadly weapon, or an object, a deadly weapon, the exact nature and description of which is unknown to the Grand Jurors, and unknowable to the Grand Jurors;

> Or if you find from the evidence beyond a reasonable doubt that the defendant did unlawfully then and there knowingly cause serious bodily injury to [M.I.], a child fourteen years of age or younger, hereinafter called complainant, by striking the complainant against a floor, a deadly weapon, or by striking complainant against a fireplace hearth, a deadly weapon, or by striking complainant with and against an object, a deadly weapon, the exact nature and description of which is unknown to the Grand Jurors, and unknowable to the Grand Jurors, then you will find the defendant guilty of knowingly or intentionally causing serious bodily injury to a child as charged in the indictment.

The definition and application portions of the jury charge also included the lesser included offense of recklessly causing injury to a child. Neither the State nor Romero objected to the trial court's charge.

The application portion of the trial court's jury charge alleged three theories by which the jury could have found Romero guilty. Although the portion of the jury charge defining "intentionally" includes the phrase "engage in the conduct or," the application paragraph limited the offense to "intentionally cause serious bodily injury."

Second, we review the state of the evidence. *See Allen*, 253 S.W.3d at 264; *Almanza*, 686 S.W.2d at 171. The evidence adduced at trial showed that M.I. suffered serious bodily injury, was only two years old at the time of her injuries, Romero and A.K., who was one year old, were the only others present in the apartment when M.I. was injured, Romero gave inconsistent statements and implausible explanations relating to M.I.'s injuries, and Romero absconded, fleeing prosecution for nine years.

Third, we review the argument of counsel. *See Allen*, 253 S.W.3d at 264; *Almanza*, 686 S.W.2d at 171. In the first part of the State's closing argument, the State argued

> What we know beyond all doubt from what you heard from the evidence is that this was an intentional act. Every doctor who treated this baby told you this was an intentional act. . . .
>
> This was an intentional act. . . .
>
> I told you that you could look at everything to determine whether a person acted intentionally, before, during, after. . . .
>
> The doctors told you that this was an intentional act. The brain, the fractures, all the bruising that they saw, this was an intentional violent act, and [Romero] knew, because that's why she fled the country, leaving everything behind.

However, during defense counsel's closing argument, he referred to the court's charge, stating, in part, the jury had to decide "whether this is intentional, that is, [Romero] intended that this result occur." Then, during the second part of the State's closing argument, the State argued, in

part, "Actually, your job is going to be easy.  We know it was an intentional act.  We know it was her."

We consider the totality of the circumstances as well as the fact that, although the State argued Romero intended the act, the State did not argue or suggest that the jury did not have to find that Romero intended to cause the result.  Further, it was Romero's defensive theory that she was not present in the room when M.I. was injured and that M.I.'s injury was the result of an accident.

Finally, we consider any other information revealed by the record of the trial as a whole. *See Allen*, 253 S.W.3d at 264; *Almanza*, 686 S.W.2d at 171.  The record shows the indictment alleged Romero "intentionally and knowingly cause[d] serious bodily injury to [M.I.]."  Romero concedes that the portion of the jury charge containing the definition of knowingly was correct.  Further, the jury's verdict states the jury found Romero "guilty of intentionally or knowingly causing serious bodily injury to child as charged in the indictment."  Accordingly, the jury could have found that Romero knowingly caused serious bodily injury to M.I.

Even though the trial court included an instruction in the jury charge that authorized the jury to convict Romero of injury to a child if they found that she intentionally "engage[d] in the conduct," we conclude that Romero has not shown that the error resulted in egregious harm. Issue two is decided against Romero.

## IV.  MODIFICATION OF THE JUDGMENT

In its sole issue on cross-appeal, the State argues the judgment should be modified to reflect the correct statute for the offense.  The State argues the trial court's judgment incorrectly lists the statute for the offense as section 22.01 of the Texas Penal Code.

Romero was indicted for the offense of injury to a child.  Section 22.04(a)(1) of the Texas Penal Code states that "[a] person commits [the offense of injury to a child] if he intentionally,

–14–

knowingly, recklessly, or with criminal negligence, by act . . . causes to a child . . . serious bodily injury." TEX. PENAL CODE ANN. § 22.04(a)(1). The jury charge reflects that the jury found Romero "guilty of intentionally or knowingly causing serious bodily injury to a child as charged in the indictment." The trial court's judgment states that Romero was convicted of the offense of "Injury to a Child Serious Bodily Injury." However, the trial court's judgment also lists the statute for the offense as "22.01 Penal Code." Section 22.01 of the Texas Penal Code defines the offense of assault. TEX. PENAL CODE ANN. § 22.01 (West Supp. 2014).

An appellate court has the authority to modify an incorrect judgment to make the record speak the truth when it has the necessary information to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993) (en banc); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we conclude the trial court's judgment should be modified to reflect the correct statute for the offense, which is section 22.04 of the Texas Penal Code. Issue one of the State's cross-appeal is decided in favor of the State.

Also, although neither party raises the issue, we observe the judgment states that the deadly weapon finding was "N/A." However, the indictment alleged Romero:

> unlawfully then and there intentionally and knowingly cause[d] serious bodily injury to [M.I.], a child 14 years of age or younger, hereinafter called complainant, **by throwing and pushing complainant into a chair with her hands, a deadly weapon, and causing complainant to strike the floor, a deadly weapon, and a fireplace, a deadly weapon, and object, a deadly weapon**, the extant nature and description of which is unknown to the Grand Jurors, and unknowable to the Grand Jurors.

> and did unlawfully then and there knowingly cause[d] serious bodily injury to [M.I.], a child 14 years of age or younger, hereinafter called complaint, **by striking the complainant against a floor, a deadly weapon, and by striking complainant against a fireplace hearth, a deadly weapon, and by striking complainant with an against an object, a deadly weapon,** the exact nature and description of which is unknown to the Grand Jurors, and unknowable to the Grand Jurors.

–15–

(Emphasis added). Also, the jury charge "instructed that a deadly weapon is a firearm, or anything manifestly designed, made, or adapted for the purpose of inflicted death or serious bodily injury, or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." The application paragraphs also referred to the use of a deadly weapon. The jury found Romero guilty as charged in the indictment. *See Crumpton v. State*, 301 S.W.3d 663, 664 (Tex. Crim. App. 2009) (jury's verdict was finding that defendant used deadly weapon as verdict expressly found defendant guilty of the offense "as included in the indictment" and indictment expressly alleged defendant committed offense with "a deadly weapon). Accordingly, we conclude the trial court's judgment should be modified to state that the jury found Romero used a "deadly weapon, not a firearm." *See* TEX. R. APP. P. 43.2(b); *Bigley*, 865 S.W.2d at 27–28; *Asberry*, 813 S.W.2d at 529–30 (appellate court has authority to sua sponte modify incorrect judgment to make record speak the truth when it has necessary information to do so).

## V. CONCLUSION

The evidence is sufficient to support Romero's conviction. Also, even though the trial court included an instruction in the jury charge that authorized the jury to convict Romero of injury to a child if they found that she intentionally "engage[d] in the conduct," Romero has not shown that she suffered egregious harm. Further, the judgment lists an incorrect statute for the offense and fails to list that Romero used a deadly weapon.

The trial court's judgment is affirmed as modified.


_/ Douglas S. Lang/_
DOUGLAS S. LANG
JUSTICE


Do Not Publish
TEX. R. APP. P. 47
131586F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SYLVIA ROMERO, Appellant

No. 05-13-01586-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 6, Dallas County, Texas
Trial Court Cause No. F-01-16575-X.
Opinion delivered by Justice Lang. Justice Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

    (1) The portion of the trial court's judgment that states "Statute for Offense: 22.01 Penal Code" is modified to state "Statute for Offense: 22.04 Penal Code"; and

    (2) The portion of the trial court's judgment that states "Findings on Deadly Weapon: N/A" is modified to state "Findings on Deadly Weapon: Deadly Weapon, Not a Firearm."

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 17th day of April, 2015.