**AFFIRMED; Opinion Filed April 3, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00023-CR

### ABEY BELETTE GIRMA, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 283rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F12-59177-T**

## OPINION

Before Justices Bridges, Lang-Miers, and Myers
Opinion by Justice Myers

A jury convicted appellant Abey Belette Girma of capital murder for shooting and killing both Lemma Yayehyirad and Desta Yenenesh during the same criminal transaction. *See* TEX. PENAL CODE ANN. § 19.03(a)(7)(A). Appellant was sentenced to life in prison without parole. He argues that the evidence does not prove he had the specific intent to kill each of the victims. We affirm.

### BACKGROUND AND PROCEDURAL HISTORY

Shortly after midnight on August 15, 2012, Lemma Yayehyirad (Yared) and his wife, Desta Yenenesh (Salome), were shot to death in the doorway of the residence they shared at the 5700 block of Marquita Avenue, in Dallas, Texas. Each victim had three gunshot wounds: Yared was shot in the head, the left side of the chest, and the left side of his face; Salome was shot on the left side of her face, her left breast, and had gunshot wounds to her right index finger

and thumb. According to the medical examiner, Dr. Chester Gwin, the shooter could have been standing up to two or three feet away.

Asmaru Mebrate, Yared's mother, lived with Yared and Salome. On the night of the offense, she was awakened by three gunshots, followed by the sound of a woman screaming, followed by three more gunshots. She opened the blinds and saw a man walking towards a black SUV. When she went outside and found Yared and Salome lying on the ground, bleeding, she screamed, went back into the house, and called 911.

Detective Steve Hough with the Dallas Police Department collected evidence at the crime scene. When he first arrived, it was dark and "pouring down rain." A crowd of people was gathered at the end of the street. He walked up to the residence and saw Yared and Salome lying in the doorway, and near their bodies he found a couple of fired cartridge casings. The detective took photographs of the crime scene and collected the cartridge casings. No firearms or other weapons were found at the crime scene.

Lupaka Patrick Djungu-Sungu and appellant worked together at Casey Limousine International and had an assignment working for Deloitte Company. They would chauffeur Deloitte clients from the Dallas–Fort Worth Airport to Deloitte University, the company's off-site training facility in Southlake. They spent time together after work and by the time of the shooting had known each other for two or three months. The day before the shooting, August 14, 2012, appellant and Djungu-Sungu returned to Dallas after having spent the night at the Winstar Casino with another individual from work. They had lunch with appellant's girlfriend at the hospital, and then appellant left for a medical appointment. Later that day, appellant and Djungu-Sungu had dinner at appellant's house. At some point after midnight—Djungu-Sungu was not sure about the time—appellant called him and asked if they could meet; appellant sounded desperate. He was crying and spoke as though "something happened to him."

Appellant started apologizing. Djungu-Sungu told appellant that he could not meet with him because he had to be at work in a couple of hours, but he told appellant they could meet at work at 3:00 a.m. Djungu-Sungu, however, overslept and was late to work; he did not start his shift until around 3:15 or 3:30. He completed a driving assignment and returned to the airport after 5:00 a.m., by which point appellant was calling Djungu-Sungu and asking him where he was. He told appellant that he was at the airport on his way to the staging area. When appellant arrived at the staging area, Djungu-Sungu noticed he was driving a personal vehicle, a black SUV—a Ford Escape. Appellant was not wearing his uniform, which was unusual given that drivers wore uniforms and never drove their personal vehicles to the airport.

Appellant got in the back seat of the van Djungu-Sungu was driving, pulled out a gun, and told Djungu-Sungu that he was under his control and that if he did what appellant told him to do, nothing would happen to him. Appellant ordered Djungu-Sungu to buckle his seat belt and record what appellant was going to tell him. After Djungu-Sungu activated the voice recorder on his phone, appellant told him he had shot two people and that he was not sure whether they were dead. He also told Djungu-Sungu that he was going to kill certain people at his work—the other drivers and some of the dispatchers—and his boss because they were racist. Djungu-Sungu asked appellant not to do it; appellant said he was going to proceed. Appellant then turned on a television in the van to determine whether the two people he shot were actually dead. He saw a news report about two people who were "fatally wounded," but appellant did not understand that this meant the two people were dead. He told Djungu-Sungu there were two scenarios. If the two people were dead, he was going to go to work and "shoot everybody," and then "go on to other things." Djungu-Sungu recalled that appellant talked about doing "all kinds of stuff," such as hijacking a plane. If, however, the two people appellant shot were not dead, he would go back and shoot them. Appellant added that he had had a relationship with one of the people he shot,

and also killed her husband; he regretted that he did not use his silencer. Appellant spoke about how he befriended the woman and they were in love, but he was talking incoherently, jumping from one subject to another, and was not making much sense. He was very emotional and showed Djungu-Sungu videos of a woman and her young child, as well as text messages or e-mails they had exchanged.

Appellant wanted Djungu-Sungu to drive him to Deloitte University because he was still intent on shooting his co-workers. But appellant eventually changed his mind when Djungu-Sungu told him there are "tons" of surveillance cameras at the facility, so they drove back to the company's airport staging area. They eventually ended up at the company's main office, where they saw their boss there working on a vehicle. With appellant standing behind Djungu-Sungu holding the gun, appellant told their boss that Djungu-Sungu "was going to take some time off." Their boss agreed, after which appellant asked for some time off. He did not agree to that, and told appellant he was supposed to work that afternoon. Djungu-Sungu testified that the workers in the office could see he "was distraught because I was sweating and all that stuff." Djungu-Sungu and appellant ultimately left the office. Appellant told Djungu-Sungu to go to his personal vehicle, a blue Nissan, and that they were leaving town.[1]

Appellant did not tell Djungu-Sungu where they were going at first; he drove the car with one hand and kept the gun in his pocket. After thirty minutes or so, he said they were going to Denver, Colorado because appellant knew relatives and an ex-girlfriend who lived there. They stopped only for gas, which they paid for using Djungu-Sungu's ATM card. The first few times they stopped, appellant would not allow Djungu-Sungu, who is diabetic, to use the restroom, so when he had to urinate he was forced to do so along the side of the road. They switched drivers

---

[1] Appellant did not want to take the company vehicle because it had a GPS tracking device.

and appellant eventually allowed Djungu-Sungu to use the bathroom, but followed him closely and waited for him in front of the door. He told Djungu-Sungu that if he made a "wrong move" he would kill him. At one point appellant received a telephone call from his girlfriend, and they spoke in a language Djungu-Sungu did not understand.

By the time they reached Goodland, Kansas, they had been driving for almost eighteen or twenty hours. They had to purchase gas and appellant, who was driving, learned from someone at a McDonald's drive-thru that the Wal-Mart across the street had an ATM machine. Appellant told Djungu-Sungu that he wanted to use the ATM to empty Djungu-Sungu's bank account, and he also "wanted to buy some things to disguise himself." Shortly before they entered the Wal-Mart, however, appellant, who was walking next to Djungu-Sungu, stopped in front of the entrance, thinking "they might have metal detectors." Suspecting this could be his last chance to escape, Djungu-Sungu told appellant the store had metal detectors. Appellant decided to leave the gun in the car, placing it between the driver's and passenger's seat. Inside the store, while appellant was looking at clothing, Djungu-Sungu noticed he was holding the car keys in his hand. Djungu-Sungu reached over and tried to grab the keys, but slipped and fell. Appellant reached down to get the keys and Djungu-Sungu ran in the other direction, screaming and yelling that appellant was a killer and that they should call the police. No one responded to Djungu-Sungu at first, but he eventually got the attention of store manager who took him to an office and called the police. That was the last time Djungu-Sungu saw appellant.

Asmale Teshome, a mother of three, lived in Aurora, Colorado, which is in the Denver area. She testified that on August 16, 2012, she went to her Ethiopian Church to drop off her babysitter and four-year-old child for religious services, but did not stay because she had to take her other children to school. Appellant came up to her in the church's parking lot and started a conversation, asking Teshome her name, whether she lived in Denver, where she worked, and

her phone number. Teshome told appellant she was married, thinking that would cause him to leave her alone, but appellant "didn't take 'no' for an answer." He continued talking to Teshome and her children, and at one point he went to the back of the car and looked at her license plate. He also asked Teshome if she loved her children and where she was going. She drove away.

The following day, August 17, Teshome went to her church at around noon to attend religious services. She dropped off the babysitter in front of the church, and when she went to park her car she saw appellant get out of a blue Nissan and walk quickly towards her. He was wearing the same clothes he had worn the previous day. Teshome ran towards the church and went inside, but appellant followed her into the church. She noticed he was watching her. After the service, bread and water was served. Appellant shook hands with Teshome and her children and greeted them as if he knew them, after which he grabbed "a bunch of water and a bunch of bread" and took it with him. Out in the parking lot, as Teshome drove away, appellant waived at her and smiled.

When she got home from church, Teshome spoke to a friend on the telephone and learned that a man who used to live in Colorado had killed two people in Dallas, and that he was now back in Colorado. She also read about the Dallas shooting on a Facebook page that the Ethiopian community used to post news and other information. Teshome and her children recognized the photograph of the man on the Facebook posting as the same man that approached them at their church. Then they heard a knock on the door. Teshome looked out an upstairs window and saw a man; it was appellant. Teshome started screaming. Her friend, who was still on the phone, told her to call the police. Appellant eventually told Teshome that his name was Abey Girma. She had never met him prior to the day before, and believed appellant must have followed her home from church, since she lived only ten minutes away.

Officer Darrell Huntsman of the Aurora Police Department testified that on August 17,

2012, he was dispatched to Teshome's residence to investigate a suspicious incident. When he arrived, Teshome was crying and very upset. She told the officer that she met a man named Abey at her church, and that this man told her he killed two people in Dallas.[2] She also described the car appellant was driving, which was a blue Nissan Versa with a Pennsylvania license plate. Officer Huntsman spoke to Detective Michael Yeric with the Dallas Police Department and confirmed that a person by the name of Abey Girma was involved in an alleged homicide that occurred in Dallas. Officer Huntsman issued a be-on-the-lookout (BOLO) alert for appellant and the vehicle he was seen driving. Shortly thereafter, law enforcement officers stopped and arrested appellant as he was driving in the vicinity of the Ethiopian Orthodox Church. After appellant was taken into custody, Officer Huntsman notified Detective Yeric. Officer Huntsman also learned that Dallas police were looking for a nine millimeter handgun.

During their inventory search of the vehicle, Aurora officers found a nine millimeter Taurus pistol in the glove box, a handgun case under the driver's side seat, and a brown satchel containing a laptop. Aurora police crime scene investigator Amanda Kelsey testified that they also found a box of ammunition and an extra magazine in the vehicle. Detective Hough testified that when Dallas police searched appellant's apartment, they found an instruction manual for a Taurus series nine millimeter handgun. Heather Thomas, a firearms and toolmark examiner with the Southwestern Institute of Forensic Sciences, examined the casings and bullets found at the crime scene and concluded they were fired by the gun found in the vehicle appellant was driving.

Detective Yeric, the lead detective in the investigation, testified that at around 10:00 p.m. on August 15, 2012, he received a telephone call from a detective in Goodland, Kansas, regarding Djungu-Sungu's report that he had been kidnapped by a man who killed two people in

---

[2] Teshome testified that she learned appellant had killed two people from her friend and from information on the Ethiopian community's website.

Dallas. The following day, he drove to Goodland and interviewed Djungu-Sungu. Based on information Djungu-Sungu provided, Detective Yeric contacted detectives in Dallas to obtain a warrant for appellant's arrest and a search warrant for the apartment of appellant's girlfriend. On August 18, not long after he returned to Dallas, Detective Yeric received a telephone call notifying him that appellant had been arrested in Aurora, Colorado. The next day, he flew to Aurora and interviewed appellant.

During that interview, which was recorded,[3] appellant admitted shooting Yared and Salome. He told the detective that he knew Salome in Ethiopia before she was married, and that he learned she was in Dallas when, two years earlier, he saw her at the Ethiopian restaurant owned by Salome and her husband. At that point, he had not seen her for ten or eleven years. Salome and appellant rekindled their relationship, but appellant said that, at first, he did not know she was married. Appellant suspected Yared may have known about the relationship, but he could not be sure. He thought Yared may have been responsible for an incident at the restaurant where someone threw a whiskey glass at appellant that cut his ear, forcing him to go to the hospital for stiches. Appellant wanted to end the relationship. Salome, however, insisted on continuing the relationship.

One day, after meeting Salome at a Wal-Mart, he got home and discovered she had left some of her personal belongings in his car. Appellant went back to the restaurant to return Salome's possessions and confess his love for her. He also wanted to talk to Yared. But since there were other people at the restaurant, he decided to wait until it closed and followed them home. Appellant watched Yared and Salome get out of their car and walk up to their front door. When he called Salome's name, she stopped. Yared and appellant talked for about ten minutes, with Yared and Salome standing on the porch and appellant in the yard. The conversation grew

---

[3] A video recording and transcript of the interview were admitted at trial.

more heated; Yared insulted appellant. When he started moving around, appellant pulled out his gun and told him, "Don't move." Salome jumped in the middle and was trying to pull something out from her purse. Yared was doing something behind her that appellant could not see. Appellant started shooting. He thought that he shot Yared first, but it was too dark to see where he shot him. Appellant told Detective Yeric that he did not want to shoot anyone, but that he was "ready for anything."

DISCUSSION

Appellant's sole issue challenges the sufficiency of the evidence to prove he had the specific intent to kill Salome. We review appellant's sufficiency challenge by considering all the evidence in the light most favorable to the verdict; based on that evidence and any reasonable inferences, we must determine whether a rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014). Under this standard, the fact finder has full responsibility for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. We presume the fact finder resolved any conflicts in the evidence in favor of the verdict and defer to that determination. *See id*. at 326. We do not reassess witness credibility. *Thornton*, 425 S.W.3d at 303.

Appellant was indicted for capital murder. A person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1). A person commits capital murder if the person commits murder as defined by section 19.02(b)(1) and murders more than one person during the same criminal transaction. *Id*. § 19.03(a)(7)(A). In order to prove capital murder under section 19.03(a)(7)(A), the State must establish a discrete, specific intent to kill as to each death. *See Ex parte Norris*, 390 S.W.3d 338, 340 (Tex. Crim.

–9–

App. 2012). The jury may infer the intent to kill from the defendant's acts, words, or conduct, *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967) (quoting *Kincaid v. State*, 150 Tex. Crim. 45, 198 S.W.2d 899, 900 (Tex. Crim. App. 1946)), *see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (intent may be inferred from circumstantial evidence such as acts, words, and conduct of accused), and from any facts in evidence it believes prove the existence of that intent, such as the use of a deadly weapon. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). If a deadly weapon, such as a firearm, is used in a deadly manner, the inference is almost conclusive that the defendant intended to kill. *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993); *see also Womble v. State*, 618 S.W.2d 59, 64 (Tex. Crim. App. [Panel Op.] 1981) ("In fact, where a deadly weapon is fired at close range and death results the law presumes an intent to kill."); *Garcia v. State*, No. 13–03–00722–CR, 2006 WL 1965813, at *3 (Tex. App.—Corpus Christi Jul. 13, 2006, pet. ref'd) (mem. op., not designated for publication) ("The jury could reasonably infer that by shooting Miguel five times, appellant specifically intended to kill him.").

The record in this case shows that appellant used a firearm to shoot both Yared and Salome. Each victim was shot three times. The gunshot wound to Salome's face indicated that the shot was fired anywhere from a few inches to two or three feet away, according to the medical examiner. During the interview with Detective Yeric, appellant indicated that he was standing several feet from Yared when he shot him. No weapons were found at the crime scene. After the shooting appellant fled the state, briefly stopping at a Wal-Mart store in Goodland, Kansas, before continuing to Aurora, Colorado, where he was ultimately arrested. Evidence of flight or attempts to cover up guilt are relevant to show a defendant's consciousness of guilt. *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994); *Cantrell v. State*, 731 S.W.2d 84, 92 (Tex. Crim. App. 1987). Additionally, although appellant told Detective Yeric he did not

–10–

intend to kill anyone, the jury was the ultimate judge of the weight and credibility of the evidence, and it was free to either accept or reject this statement. *See Sorto v. State*, 173 S.W.3d 469, 475 (Tex. Crim. App. 2005). The jury could have reasonably concluded that by shooting both victims three times at fairly close range, appellant specifically intended to kill them. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant committed the offense of capital murder as charged in the indictment. The evidence is therefore sufficient to support the verdict. We overrule appellant's issue.

We affirm the judgment of conviction.

/ Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
140023F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

ABEY BELETTE GIRMA, Appellant

No. 05-14-00023-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 283rd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F12-59177-T.
Opinion delivered by Justice Myers. Justices Bridges and Lang-Miers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 3rd day of April, 2015.