**AFFIRMED as Modified; Opinion Filed April 29, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00138-CR

### CHUNG KIM, Appellant
### V.
### THE STATE OF TEXAS, Appellee

### On Appeal from the 291st Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. F13-52168-U

## MEMORANDUM OPINION
Before Justices Myers, Evans, and O'Neill[1]
Opinion by Justice Myers

Appellant Chung Kim was convicted of capital murder and sentenced to life imprisonment without parole. In four issues, he argues (1) the evidence is insufficient to prove he had the specific intent to kill Michelle Jackson; (2) section 12.31(a)(2) of the Texas Penal Code violates the Eighth Amendment; (3) the trial court erred by including a definition of reasonable doubt in the jury charge; and (4) the trial court lacked jurisdiction to hear the instant case and render a judgment because the case was not transferred to its docket. We affirm.

### BACKGROUND AND PROCEDURAL HISTORY

Appellant was indicted for the capital murder of Michelle Jackson and Jamie Stafford. The evidence at trial, which included testimony from witnesses and video from surveillance

---

[1] The Honorable Michael J. O'Neill, Justice, Court of Appeals, Fifth District of Dallas, Retired, sitting by assignment.

cameras, showed that the shootings occurred at around 8 a.m. on the morning of February 4, 2013, at the Sable Ridge condominiums in northeast Dallas, Texas. That morning, appellant and Michelle Jackson, who resided in the unit above appellant's with her boyfriend Stafford and their infant daughter, were heard arguing. The evidence showed that appellant and Jackson had an ongoing dispute concerning Jackson's dog—appellant claimed that feces from Jackson's dog would wash down onto his patio and windows. Shortly after they were heard arguing, appellant fired at Jackson with a semi-automatic handgun. He then went upstairs to Jackson's unit and shot her once through the neck, wounding her fatally, after which he entered the unit. More gunshots were fired inside the condominium. Witnesses saw Stafford run out of the unit and leap over the balcony to the ground. Appellant then went to the balcony and shot at Stafford from above. After leaving the upstairs unit, appellant walked to his car in the nearby parking lot, got in the car, drove forward a few feet, stopped, and got out. Appellant walked over to Stafford, who was lying on the ground, still moving, and shot him in the forehead.[2] Appellant then got back in his car and quickly drove away.

The first witness called by the State, Bobbie Barnes, testified that she was walking from her residence at Sable Ridge to her car on the morning in question, about to drive to work, when she heard two gunshots. She looked up to determine where the shots were coming from and saw, less than fifty feet away, a body fall. She could see the bottom of someone's feet, as though a body had fallen backwards. Barnes knew someone had been shot. She recalled "vaguely" hearing some yelling, screaming or arguing that morning, but it was 8 a.m. and she "wasn't tuned in to what was being said."

Barnes ran to her car and got in. As she was sitting in her car, she saw a man jump from

---

[2] According to the medical examiner, Stafford was shot seven times. There were three gunshot wounds to Stafford's head, two to his neck, one to his back, and another to the lower left forearm.

the second-floor balcony. A few seconds later, she saw another man emerge from that same balcony. Barnes saw this second man shooting down at something on ground level. She recalled that "he was very precise." Barnes testified that she heard and saw four gunshots, but thought she could have heard a total of five gunshots. After the shooting stopped, the shooter went back into the apartment. Barnes got out of her car, intending to run back to her apartment. But when she got a few steps from her car the shooter reappeared, so Barnes ducked down next to her car. She heard another gunshot and saw the shooter get in a car and drive away.

Keno Green Jacobs also lived at the Sable Ridge condominiums. He testified that, at around 8 a.m. on the morning in question, he heard gunshots and saw a man jump over the second-floor balcony, after which another man went out on the balcony and shot at the man that was on the ground a couple of times. The man on the balcony then "came around" and shot the male victim "maybe two times," as he was lying on the ground next to the bushes, after which the shooter got in his car. Jacobs was not sure how many times the victim was shot, but he was sure it was more than once. When the man on the ground moved, the shooter got out of his car, walked over to him, and shot him in the forehead.

Aubrey Keith Morris was a maintenance man at the condominium complex. He testified that at around 8 a.m. on February 4, 2013, he was in the parking lot of the complex picking up trash when he heard "some commotion going on." Morris heard a male voice yelling, and he recognized that male voice as appellant's. He looked up and saw, from a distance of about forty or fifty yards, a woman wearing a nightgown standing on the balcony of her second-floor unit. She did not appear to be holding anything in her hands. Morris testified that he saw appellant fire two gunshots from the first floor of the complex to the second, after which the woman fell backwards. Morris estimated that appellant was about sixteen, seventeen, or eighteen feet away when he shot the woman. He also believed one of the shots struck the woman as she fell.

Appellant then walked around the building, and Morris ran to the corner of the building and hid there. By the time he saw appellant again, appellant was on the second floor. Appellant stepped over the woman's body and went inside the upstairs condominium, firing two more shots. The police arrived shortly after that.

Detective Marshall McLemore, a crime scene investigator with the Dallas Police Department, was dispatched to the crime scene along with another detective, Michael Gonzalez. McLemore identified various photographs of the crime scene, including shell casings and bullet fragments, which were admitted into evidence. One of the crime scene photographs showed the female victim, Michelle Jackson, lying in the doorway of her upstairs condominium. Her feet were sticking out through the railing. McLemore testified that, based on his investigation, it appeared multiple gunshots were fired inside the condominium.

Detective Phil Gordon of the Dallas Police Department testified that he was on duty on February 4, 2013, when he received a description of a black Lexus SUV that could possibly be the suspect vehicle. The dispatch also gave the vehicle's plate number. Gordon recalled the last four digits of the license plate because they were 2000 and that "stuck in my mind." He saw a black SUV matching that description driving north on Kingsbury and then back onto Walling Street, after which it pulled into a dry cleaner's at a shopping center. Gordon saw appellant get out of the car and walk into the cleaners. Gordon radioed the police dispatcher for further information to see if they had a description of the suspect and was told the suspect's name was "Kim Chung." By that point, appellant had driven off. Gordon drove around the building and found the vehicle parked at a nearby Comerica, which was about three or four hundred yards away. Appellant was not in the vehicle. Officers searched the area and another officer eventually spotted appellant and took him into custody.

At around 4:20 p.m. on February 4, 2013, Officer Christina Miranda, a crime scene

investigator with the Dallas Police Department, was called to the auto impound lot to process appellant's vehicle, a black Lexus sport utility RX 330. The license plate number of the vehicle was BDF2000. Miranda found a gun holster among other items in the trunk, and a .45 caliber Glock semi-automatic pistol under the driver's seat. There was a .45 Cor-Bon cartridge in the chamber. The magazine in the gun was loaded, and a fully-loaded magazine (with ten cartridge cases) was found in the holster.

Carlota Robinson is the president of the homeowners' association at the Sable Ridge condominium complex. She testified that at around 8 a.m. on the date of the offense, she was at her residence in building six, on the opposite side of the complex from the location of the offense, when she heard a man banging on her door and screaming. When she finally calmed him down, the man, Keno Jacobs, incorrectly reported that someone had shot and killed the maintenance man. Robinson called 911 and notified them that there had been a shooting on the property. When she drove over to the office, police and fire department personnel were already there.

One of Robinson's duties was to manage the complex's surveillance video system. A DVD containing surveillance video from the date of the offense was admitted without objection during her testimony and played for the jury. The DVD contains video from three camera viewpoints: the front of the building looking out from the office; the parking lot looking towards the back of the north side of the complex; and the swimming pool and walkway and breezeway for building five of the complex, where the offense occurred. Before the video was played for the jury, Robinson testified that both the downstairs unit owned by appellant and the upstairs unit, which was rented by the decedents Michelle Jackson and Jamie Stafford, are visible in the video. She could not, however, identify any of the figures seen in the video footage.

Just before 7:47 a.m.[3] on the video footage of the swimming pool area, a figure can be seen walking in front of appellant's condominium unit. At 7:51 a.m., a figure can be seen walking into the area of appellant's condominium, and then disappearing from view. A person is then seen going up the stairs towards the decedents' unit. A second person standing on the balcony of the decedents' unit then appears to "just drop down," as Robinson stated in her testimony. The first individual then appears to briefly enter the upstairs condominium before going back down the stairs and walking out of camera view at 7:54 a.m. Meanwhile, at 7:52 a.m. on the video footage of the parking lot area, Aubrey Morris can be seen picking up trash in the parking lot. Shortly after 7:53 a.m., he bends over to pick up a piece of trash, pauses, looks up at the nearby condominium units, and runs away. After 7:54 a.m. on that same video feed, a figure can be seen walking towards a black SUV in the parking lot. This person gets in the car and backs out of the parking space, drives forward a few feet, and stops. The individual gets out of the vehicle, walks toward the right side of the video screen, out of camera view, and then returns to the vehicle and quickly drives away.

Robinson also testified that there had been a long-running dispute between appellant and the residents in the unit above him concerning dog feces. Appellant's upstairs neighbors had a dog, and he claimed that dog feces would wash down from their unit onto his patio and back windows. According to Robinson, this dispute had been going on for approximately six to eight months before the shootings, and appellant had complained to the homeowners' association as well as the police and health department about the dog feces. A series of e-mails that Robinson sent to her board of directors and her management company regarding the ongoing dispute, which were introduced by the defense, show how the dispute escalated. One e-mail sent by Robinson on January 14, 2013, less than a month before the shootings, stated: "This is not the

_____

[3] The time on the video footage is actually 08:47, but Robinson testified that the clock was running one hour ahead.

–6–

first report on this unit. The issue has been ongoing for months and Mr. Kim has been ignored. Mr. Kim is about to reach his breaking point." Yet another e-mail stated that Robinson had a conference call with the complex's security officer and the owner of the upstairs unit, and that the owner was going to start eviction proceedings against the occupants on February 1, 2013. But Robinson testified that she had not contacted appellant after her conversation with the owner of the upstairs unit, and she was not sure whether anyone else had done so.

Dr. Janice Townsend-Parchman, a Dallas County medical examiner, performed the autopsy on Michelle Jackson. The autopsy showed that Jackson died from a gunshot wound that entered the left side of her neck and exited the right side of her neck. The gunshot fractured the first two vertebrae and almost severed the spinal cord, and then went through the right side of the neck. Given the severity of the wound, Jackson lost consciousness within seconds and was likely dead within a few minutes. Based on the stippling found on Jackson's skin, which is caused by unburned or partially burned particles of gunpowder that come out of the muzzle of the gun, Dr. Townsend-Parchman believed the shot was fired from a range of one to three or four feet "and probably further rather than closer." She acknowledged that without knowing the gun or the ammunition and having it test fired, "you can't be terribly precise." But the doctor also testified that "you would be hard-pressed to find a handgun that's going to leave much stippling beyond four feet," so the chances were "almost for sure" that the handgun was fired no more than four feet from the surface of the victim's body. Based on a "standard anatomic position" of a person standing in front of another with face forward, feet slighty apart, and arms down at the side, palms forward, Dr. Townsend-Parchman concluded the gunshot that killed Jackson, who was sixty-four inches tall, "went through her left to right slightly back to front and very slightly downward," and that it was "[a]lmost across." Assuming the shooter was standing, the shooter and Jackson would "need to be more or less on the same level," but the doctor added that she had

no way of knowing what position "the shooter is in." Dr. Townsend-Parchman ruled the manner of death a homicide by firearm.

Kenneth Balagot, a forensic biologist and DNA analyst with the Southwestern Institute of Forensic Sciences, testified that he took three DNA samples from the holster that was recovered from appellant's vehicle. The first sample contained a trace genetic marker that matched or corresponded with a genetic marker observed in the DNA profile of the decedent Jamie Stafford. The second contained a set of genetic markers that matched or corresponded with the genetic markers observed in the DNA profile of the decedent Michelle Jackson. The third sample from the holster was a partial DNA profile with a single male, and that DNA profile matched the DNA profile of appellant. Balagot agreed that if a person had a holster on his hip or in his hand, and there was blood spatter or if a gun was fired and blood was ejected from the wound and ended up on the holster, a sample taken from a blood stain on the holster could possibly allow him to obtain a DNA profile. Balagot also agreed that if a person held a holster and put a gun in it, that person could possibly leave his DNA on the holster.

## DISCUSSION

### 1. Sufficiency of the Evidence: Specific Intent to Kill Michelle Jackson

In his first issue, appellant argues the evidence is insufficient to prove he had the specific intent to kill Michelle Jackson.[4] We review appellant's sufficiency challenge by considering all the evidence in the light most favorable to the verdict; based on that evidence and any reasonable inferences, we must determine whether a rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014). Under this standard, the fact finder has full responsibility for resolving conflicts in the testimony, weighing the

---

[4] Appellant does not challenge the sufficiency of the evidence regarding his intent to kill Jamie Stafford, so we do not address that issue.

evidence, and drawing reasonable inferences from basic facts to ultimate facts. *Jackson*, 443

U.S. at 319. We presume the fact finder resolved any conflicts in the evidence in favor of the

verdict and defer to that determination. *See id*. at 326. We do not reassess witness credibility.

*Thornton*, 425 S.W.3d at 303.

A person commits murder if he intentionally or knowingly causes the death of an

individual. TEX. PENAL CODE ANN. § 19.02(b)(1). A person commits capital murder if the

person commits murder as defined by section 19.02(b)(1) and murders more than one person

during the same criminal transaction. *Id*. § 19.03(a)(7)(A). In order to prove capital murder

under section 19.03(a)(7)(A), the State must establish a discrete, specific intent to kill as to each

death. *See Ex parte Norris*, 390 S.W.3d 338, 340 (Tex. Crim. App. 2012). The jury may infer

the intent to kill from the defendant's acts, words, or conduct, *Hall v. State*, 418 S.W.2d 810, 812

(Tex. Crim. App. 1967) (quoting *Kincaid v. State*, 150 Tex. Crim. 45, 198 S.W.2d 899, 900 (Tex.

Crim. App. 1946)), *see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (intent

may be inferred from circumstantial evidence such as acts, words, and conduct of accused), and

from any facts in evidence it believes prove the existence of that intent, such as the use of a

deadly weapon. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). If a deadly

weapon, such as a firearm, is used in a deadly manner, the inference is almost conclusive that the

defendant intended to kill. *Adanadus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993);

*Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986); *Womble v. State*, 618 S.W.2d

59, 64 (Tex. Crim. App. [Panel Op.] 1981).

The record in this case shows that appellant used a firearm to shoot both Michelle

Jackson and Jamie Stafford. There is evidence appellant shot at Jackson when he was standing

underneath her patio, and there is also evidence he went upstairs and shot her from a distance of

no more than four feet with a .45 caliber weapon. After the shooting, appellant fled the crime

scene, briefly stopping at a dry cleaner's before being taken into custody. Evidence of flight or attempts to cover up guilt are relevant to show a defendant's consciousness of guilt. *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994); *Cantrell v. State*, 731 S.W.2d 84, 92 (Tex. Crim. App. 1987). Additionally, the video from the condominium complex's surveillance cameras, while being somewhat blurry and showing no recognizable individuals, corroborates the witnesses' testimony regarding the sequence of events. DNA from both victims was found on the gun holster recovered from the trunk of appellant's Lexus SUV.

Appellant argues that if he had the specific intent to kill Jackson "he certainly would have shot her more than once," as he did Stafford. Appellant further argues that he only intended to kill Stafford and that "[t]his is proven by the fact that he stepped over Jackson, who had fallen in the doorway, and then pursued Stafford through the apartment." But we defer to the trier of fact on issues such as these, which involve the weight and credibility of the evidence. The jury in this case could reasonably conclude from the evidence that by shooting at Jackson from his first-floor unit, and then going up the stairs to her condominium and shooting her in the neck at close range with a deadly weapon, appellant specifically intended to kill her. Viewing the evidence in the light most favorable to the verdict, we conclude a rational trier of fact could have found beyond a reasonable doubt that appellant committed the offense as charged in the indictment. The evidence is therefore sufficient to support the verdict.[5]

### 2. Section 12.31(a)(2) of the Texas Penal Code

In his second issue, appellant argues that section 12.31(a)(2) of the penal code is unconstitutional because a sentence of life imprisonment without parole, absent an individualized sentencing hearing, violates the Eighth Amendment. The State responds that appellant failed to

---

[5] We also note that the portion of appellant's brief devoted to this argument, like the remainder the argument section of his brief, does not contain a single citation to the record. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and the record.").

preserve this argument for appellate review or, alternatively, his argument is not supported by Supreme Court precedent.

Appellant was charged with capital murder, and the State did not seek the death penalty. Thus, once the jury found appellant guilty of capital murder, appellant automatically received a sentence of life imprisonment without parole. *See* TEX. PENAL CODE ANN. § 12.31(a)(2).

To preserve his issue for review, appellant had to object at trial on the same grounds he raises on appeal and obtain a ruling. *See* TEX. R. APP. P. 33.1(a)(1); *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995) (appellant did not preserve complaint that death sentence was cruel and unusual punishment because appellant did not object at trial on this basis); *Castaneda v. State*, 135 S.W.3d 719, 723 (Tex. App.—Dallas 2003, no pet.). Appellant did not complain about the sentence either at the time it was imposed or in his motion for new trial. As a result, appellant did not preserve this issue for our review. *Curry*, 910 S.W.2d at 497; *Castaneda*, 135 S.W.3d at 723.

Furthermore, even if we assume for the sake of argument that appellant preserved this issue, it is without merit because the Supreme Court has rejected the argument that the Eighth Amendment forbids a state from imposing a mandatory sentence of life imprisonment without parole. *See Harmelin v. Michigan*, 501 U.S. 957, 961, 994–96 (1991) (upholding mandatory sentence of life imprisonment without parole for cocaine possession); *see also Ex parte Chavez*, 213 S.W.3d 320, 324 n. 20 (Tex. Crim. App. 2006) ("[T]he Eighth Amendment does not mandate individualized sentencing in non-capital cases."); *see also Straughter v. State*, No. 05–10–00163–CR, 2011 WL 2028234, at *2 (Tex. App.—Dallas May 25, 2011, no pet.) (mem. op., not designated for publication).

Appellant cites the Supreme Court's more recent decision in *Graham v. Florida*, 560 U.S. 48 (2010). But *Graham* does not support the argument that the Eighth Amendment requires

the states to conduct individualized sentencing determinations before imposing a sentence of life imprisonment without parole. *Straughter*, 2011 WL 2028234, at *3. In *Graham*, the Court held that the Eighth Amendment categorically forbids the imposition of a sentence of life imprisonment without parole on a juvenile offender who did not commit homicide. 560 U.S. at 81–82. *Graham* does not address the constitutionality of a mandatory sentence in a case such as this. *See Straughter*, 2011 WL 2028234, at *3. We have previously concluded that *Harmelin* is controlling in these situations and that the Eighth Amendment does not forbid mandatory sentencing in noncapital cases. *See id.* (citing *Wilkerson v. State*, No. 14–09–00025–CR, 2011 WL 1643567, at *1–3 (Tex. App.—Houston [14th Dist.] May 3, 2011, pet. ref'd) (not designated for publication). We overrule appellant's second issue.

### 3. The Definition of Reasonable Doubt in the Jury Charge

In his third issue, appellant contends that the trial court erred by including a definition of reasonable doubt in the jury charge. Appellant's argument is based on the part of the charge entitled "Presumptions and Burden of Proof," where the jury was instructed, in part, "It is not required for the State to prove the defendant's guilt beyond all possible doubt; it is required that the State's proof excludes all 'reasonable doubt' concerning the defendant's guilt." Appellant argues that this paragraph constitutes a definition of reasonable doubt, which was improper.

We first rejected this argument in *O'Canas v. State*, 140 S.W.3d 695, 700–02 (Tex. App.—Dallas 2003, pet. ref'd), and have done so on many occasions since then in opinions far too numerous to list here. *See, e.g.*, *Bates v. State*, 164 S.W.3d 928, 931 (Tex. App.—Dallas 2005, no pet.); *Bratton v. State*, 156 S.W.3d 689, 696–97 (Tex. App.—Dallas 2005, pet. ref'd); *Robinson v. State*, No. 05–14–00521–CR, 2015 WL 1650062, at *4 (Tex. App.—Dallas April 13, 2015, no pet. h.) (mem. op., not designated for publication) (citing additional authorities). Furthermore, the court of criminal appeals has concluded that a trial court does not abuse its

discretion by giving this same instruction. *See Mays v. State*, 318 S.W.3d 368, 389 (Tex. Crim. App. 2010) (citing *Woods v. State*, 152 S.W.3d 105, 114–15 (Tex. Crim. App. 2004)). Appellant's argument is without merit. We overrule his third issue.

### 4. Transfer Order

In his fourth issue, appellant argues that the trial court in this case, the 291st Judicial District Court of Dallas County, lacked jurisdiction over this case (and therefore its judgment is void) because the indictment was presented to the Criminal District Court Number 5 of Dallas County and there is no order in the record showing jurisdiction was ever transferred by Criminal District Court Number 5 to the 291st Judicial District Court.

This argument is likewise without merit. Appellant failed to file a formal plea to the jurisdiction with the trial court. Because appellant did not file a formal plea to the jurisdiction with the trial court, he failed to preserve this issue for appellate review. *Lemasurier v. State*, 91 S.W.3d 897, 899–900 (Tex. App.—Fort Worth 2002, pet. ref'd) (fact that no transfer order contained in record is procedural matter, not jurisdictional; defendant who fails to file plea to jurisdiction waives complaint); *Gullatt v. State*, Nos. 05–13–01515–CR & 05–13–01516–CR, 2014 WL 7499045, at *3 (Tex. App.—Dallas Dec. 29, 2014, no pet.) (mem. op., not designated for publication); *Robinson*, 2015 WL 1650062, at *5. We overrule appellant's fourth issue.

### Modification of Judgment

In two cross-points, the State calls our attention to errors in the judgment. First, the trial court's judgment incorrectly states that appellant's punishment was assessed by the jury, when the punishment was actually assessed by the trial court. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071. Second, the judgment incorrectly states that appellant was convicted of "CAPITAL MURDER MULTIPAROUS," when he was convicted of capital murder where he murdered more than one person during the same criminal transaction. *See* TEX. PENAL CODE ANN. §

19.03(a)(7)(A).  We also note that the judgment incorrectly states that the "Punishment and Place of Confinement" is "Life Institutional Division, TDCJ."

We have the authority to correct the judgment of the court below to make the record speak the truth when we have the necessary information to do so.  *See* TEX. R. APP. P. 43.2(b); *see also Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd).  Consequently, we modify the judgment in this case to show that the offense for which appellant was convicted was capital murder of more than one person during the same criminal transaction, that the correct statute for the offense was section 19.03(a)(7)(A) of the penal code, that the punishment was assessed by the trial court, and that the punishment and place of confinement was life imprisonment without parole, TDCJ.

As modified, we affirm the trial court's judgment.


/ Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
140138F.U05

–14–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CHUNG KIM, Appellant

No. 05-14-00138-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas
Trial Court Cause No. F13-52168-U.
Opinion delivered by Justice Myers. Justices Evans and O'Neill participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

\* "Offense for which Defendant Convicted: CAPITAL MURDER MUTIPAROUS" should be changed to "Offense for which Defendant Convicted: CAPITAL MURDER MORE THAN ONE PERSON DURING SAME CRIMINAL TRANSACTION."

\* "Statute for Offense: 19.03" should be changed to "Statute for Offense: 19.03(a)(7)(A)."

\* "Punishment Assessed by:  JURY" should be changed to "Punishment Assessed by:  COURT."

\* "Punishment and Place of Confinement:  LIFE INSTITUTIONAL DIVISION, TDCJ" should be changed to:  "Punishment and Place of Confinement:  LIFE IMPRISONMENT WITHOUT PAROLE, TDCJ."

As **REFORMED**, the judgment is **AFFIRMED**. We direct the trial court to prepare a new judgment that reflects these modifications.

Judgment entered this 29th day of April, 2015.