

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00424-CR

———————————————

MARIO HERNANDEZ, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1513167D

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Mario Hernandez appeals from his conviction for aggravated robbery with a deadly weapon. *See* Tex. Penal Code Ann. § 29.03(a)(2). In his sole point of error, Hernandez argues that the evidence was insufficient for the jury to find that he committed aggravated robbery as a principal. We will overrule Hernandez's point, modify the judgment to reflect the correct sentencing date and to show that Hernandez pleaded "not guilty," and affirm the judgment as modified.

## I. Background

In the early morning hours of July 15, 2017, several theft incidents occurred in northwest Fort Worth. At about 2:00 a.m., the first victim opened her boyfriend's front door to see three men surrounding her running but locked car.[1] After being spotted, the men slowly walked to a convenience store next door. The victim then walked out to her car to turn it off. Before opening her car door, the victim heard one of the men fire a shot behind her, and she ran along the driver's side to the back of the car. The man stood in front of her car and pointed a gun in the victim's direction until she ran back into the house saying, "forget it, just take it." The victim described the men as Hispanic with dark hair, not very tall, slender, and wearing hoodies. The victim and her boyfriend both testified that the men left from the convenience store's parking lot in a faded red, hoodless SUV. Footage from the store's camera showed a

---

[1]The victim left her car running while visiting her boyfriend because she had to jump-start the car earlier and was afraid it would die again.

red SUV leaving the parking lot at 1:58 a.m. The front passenger was wearing a light-colored shirt.

At approximately 5:00 a.m., 82-year-old Bobbie Davis was watching a movie in his garage when something caught his attention.[2] Davis, who is hard of hearing, turned to see two men standing behind him. Davis described one of the men as "tall and thin" and the other as "a little bit shorter and thin, too." Both men wore "cutoff short pants," tennis shoes, hoodies, and face masks, and had what Davis described as "mag lights" on top of their heads. Because the men wore face masks and kept the lights directed at Davis's face, Davis could not see their faces. Both men jabbed and punched "big automatic" pistols in Davis's stomach. Davis testified that he feared that the shorter man's gun would fire because that man was more nervous and jabbed at Davis more frequently than the taller one. Davis could not hear their demands and told the two men he was hard of hearing. Davis asked, "[W]hat do y'all want, money?" and handed over $150 that he had in cash.

The taller gunman then pointed his gun towards Davis's house, and Davis yelled, "[Y]ou got my money . . . just go on and leave, just get out." Davis's stepson, Adam Bravo, heard yelling and entered the garage. Bravo saw a "small and scrawny" "kid" around 5'5" standing in the garage. That person ran down the street to a red, hoodless SUV with two other men that Bravo had not seen before. Davis and Bravo

---

[2]Davis testified that he regularly wakes at 4:00 a.m., showers, and then watches movies or paints in his garage until daylight.

heard a gunshot ring out before the SUV drove off. A fired 9 millimeter casing was later collected from the street in front of Davis's house.

While responding to calls related to the two theft incidents, Sergeant Francisco Solano with the Fort Worth Police Department learned that the assailants in both incidents were Hispanic men in a burgundy red, hoodless SUV. Sergeant Solano also learned there was at least one firearm. During a call about a third theft incident in the area, Sergeant Solano, based on his experience working robberies and his familiarity with the area, "posted up" on West Long Avenue to locate the SUV. Sergeant Solano located a burgundy red, hoodless SUV traveling eastbound on West Long Avenue and initiated a traffic stop. Four young Hispanic men with black hair were inside the SUV: Hernandez, Ryan Delgado, Enrique Perez, and Jose Garcia. On approaching the driver's side, Sergeant Solano saw Hernandez, who was sitting behind the front passenger's seat, conceal an item under the seat. After being removed from the SUV and identified, Hernandez escaped Sergeant Solano's vehicle,[3] removed one of the handcuffs, and hid in a backyard before officers apprehended him again. Three guns were later found in the SUV: a 9 millimeter, a .40 caliber, and a BB gun.

At trial, the State introduced evidence and expert testimony that the fired casing found in front of Davis's house was fired from the 9 millimeter gun found in

---

[3]Sergeants' vehicles are not equipped with a cage, and the door handle is accessible. Normal patrol vehicles have cages and a metal plate placed on the door handles.

4

the SUV. The State also introduced evidence and expert testimony that the .40 caliber gun could not be fired due to a backwards cartridge in the chamber. Further, only Hernandez's fingerprints were on the magazine of the 9 millimeter, to the exclusion of the SUV's other three occupants.

At trial, Sergeant Solano and Sergeant Carlos Cespedes identified the other three SUV occupants from pictures taken the day of the robbery. In the pictures, Delgado is wearing a light-colored shirt, long pants, and socks with sandals; Perez is wearing a blue shirt, shorts, and tennis shoes; and Garcia is wearing a black shirt, shorts, and tennis shoes. The State played police body-camera footage showing Hernandez wearing a black shirt, black shorts, and tennis shoes. Sergeant Solano identified Perez as the driver and owner of the SUV, Delgado as the front passenger, Hernandez as the rear passenger, and Garcia as the rear driver's-side passenger.

Hernandez was indicted for aggravated robbery with a deadly weapon against Davis, and a jury found him guilty. *See id.* The jury also found a repeat-offender enhancement to be true and assessed his punishment at 40 years' confinement and a $10,000 fine. The trial court sentenced Hernandez accordingly.

## II. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex.

5

Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

The standard of review is the same for direct- and circumstantial-evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). The alternative-reasonable-hypothesis theory does not apply in reviewing evidentiary sufficiency. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016) ("Although the State must prove that a defendant is guilty beyond a reasonable doubt, the State's burden does not

require it to disprove every conceivable alternative to a defendant's guilt."); *Temple v. State*, 390 S.W.3d 341, 363 (Tex. Crim. App. 2013); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("For the evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt.").

### III. Sufficiency of the Evidence

In his sole point of error, Hernandez argues that the evidence is insufficient to support his conviction because there was no evidence to show he was a primary actor in the Davis robbery. The State argues that the circumstantial evidence, and the inferences properly drawn from it, were sufficient for the jury to reasonably conclude that Hernandez was a primary actor in the robbery. We agree with the State.

To support his sole point of error, Hernandez advances three arguments: (1) there were no factually supported inferences identifying Hernandez as a primary actor;[4] (2) the State gave improper argument; and (3) the jury reached an irrational

---

[4]As part of his identity argument, Hernandez argues that a particular jury note reflects the jury's concern that he was an accomplice, not a primary actor. But a jury's motive in sending a note is not relevant to a sufficiency review. *See Smith v. State*, No. 2-05-322-CR, 2006 WL 1494616, at *3 n.2 (Tex. App.—Fort Worth June 1, 2006, pet. ref'd) (per curiam) (mem. op., not designated for publication) (sending jury notes does not impact sufficiency analysis); *cf. Cox v. State*, 931 S.W.2d 349, 353 (Tex. App.—Fort Worth 1996) ("The record does not reveal whether the jury's inquiry was due to prejudice, sympathy, or mere curiosity. In order to presume a motive behind the jury's question, we would have to indulge in speculation, and we will not."), *pet. dism'd, improvidently granted*, 951 S.W.2d 5 (Tex. Crim. App. 1997).

decision based on the State's inflammatory use of extraneous conduct.[5] Hernandez concedes—and we agree—that his second and third arguments were not preserved because he failed to object at trial, so we will not address them. *See* Tex. R. App. P. 33.1(a)(1).

Hernandez's remaining argument revolves around identification.[6] Hernandez argues that because there is no direct evidence of the robbers' identities, there is no evidence establishing his identity as one of the robbers. In support of his argument, Hernandez points to the following evidence:

- Davis and Bravo did not identify Hernandez as one of the robbers.

- Bravo identified one actor as "white complected," which Hernandez is not.

---

[5]Hernandez also argues that he could not be convicted as a party because the State never requested a parties charge for the jury. Because we hold the evidence is sufficient to uphold Hernandez's conviction as charged, we decline to address this argument.

[6]Hernandez argues two distinct alternative theories for who the primary actor could be. First, because three other individuals were present in the SUV, all passengers had equal access to the gun and could be the primary actor. Second, because the SUV was apprehended over an hour after the Davis robbery and the SUV passengers all lived near each other, the identity of the SUV passengers could have changed, and the primary actor could have been dropped off before the traffic stop. The State is not required to disprove all reasonable alternative hypotheses, and the Texas Court of Criminal Appeals explicitly rejected the alternative-hypothesis analytical construct in *Geesa v. State*, 820 S.W.2d 154, 160–61 (Tex. Crim. App. 1991). *See Wise*, 364 S.W.3d at 903.

- Hernandez was not wearing a hoodie or a mask, and neither was found on or near his person or in the red SUV.

- Hernandez's fingerprints were not on the trigger and grip of the 9 millimeter, nor could his fingerprints on the magazine be dated.

- Hernandez did not have any stolen property on his person, and his fingerprints and DNA were not found on any of the stolen items in the SUV.

"A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Hernandez v. State*, 501 S.W.3d 264, 268 (Tex. App.—Fort Worth 2016, pet. ref'd) (citing Tex. Penal Code Ann. § 29.02(a)(2)). If a person uses or exhibits a deadly weapon, the offense becomes aggravated robbery. Tex. Penal Code Ann. § 29.03(a)(2). The State may prove identity by direct or circumstantial evidence, coupled with all reasonable inferences from the evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). If the State relies on circumstantial evidence for identification, the evidence is sufficient when the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *See Temple*, 390 S.W.3d at 359–60.

Here, the jury could have found beyond a reasonable doubt that Hernandez was a principal actor who robbed Davis from the following circumstantial evidence:

- The first victim of the night described three Hispanic men with dark hair who were slender and not very tall. One man fired a gun.

- That first victim and her boyfriend described a faded red, hoodless SUV leaving the convenience store next door. Footage from the convenience store's camera showed a red SUV leaving the parking lot. The front passenger can be seen wearing a light-colored shirt.

- Davis testified that he was robbed by two men, both wearing "cutoff short pants" and tennis shoes, but one man was "tall and thin" while the other was "a little bit shorter and thin, too." Davis also said he was scared as both men had "big automatic" pistols and both jabbed and punched him in the stomach.

- Bravo heard yelling and entered the garage where he saw a short, thin man.

- Davis and Bravo heard a gunshot before a red, hoodless SUV left from across the street from Davis's house. Police collected a fired 9 millimeter casing from the street in front of Davis's house.

- While responding to the first two theft incidents, Sergeant Solano learned the assailants were Hispanic men in a burgundy red, hoodless SUV with at least one gun. Sergeant Solano located a matching SUV with four young Hispanic men inside.

- Sergeant Solano saw Hernandez, sitting in the rear passenger seat, put something under the seat. Sergeant Solano and Sergeant Cespedes identified the four SUV occupants, including Hernandez.

- After being placed in Sergeant Solano's vehicle, Hernandez temporarily escaped.[7]

- Three guns were located in the SUV including a 9 millimeter that was the source of the casing found in front of Davis's house.

- Only Hernandez's fingerprints were found on the 9 millimeter's magazine.

- Pictures taken of the other three SUV occupants on the day of the robbery show Delgado wearing a light-colored shirt, long pants, and socks with sandals; Garcia wearing a black shirt, shorts, and tennis shoes; and the relatively heavy-set Perez wearing a blue shirt, shorts, and tennis shoes.

From the last bit of summarized evidence, the jury could have reasonably eliminated Perez and Delgado as the gunmen who robbed Davis. Delgado was wearing neither short pants nor tennis shoes; Perez, a heavy-set man, did not match

---

[7]"Flight is a circumstance from which guilt may be inferred." *Cantrell v. State*, 731 S.W.2d 84, 92 (Tex. Crim. App. 1987).

Davis's or Bravo's descriptions.[8] This leaves Hernandez and Garcia, both of whom are thin and were wearing shorts the day of the robbery. Moreover, the spent casing came from the 9 millimeter found in the vehicle, and only Hernandez's fingerprints were found on that gun.

From all the circumstantial evidence and the reasonable inferences drawn from it, a rational jury could have found beyond a reasonable doubt that Hernandez was one of the two gunmen with "big automatic" pistols who intentionally or knowingly threatened or placed Davis in fear of imminent bodily injury or death while committing theft with an intent to obtain or maintain control of Davis's $150. Viewing the evidence in the light most favorable to the verdict, we hold the evidence is sufficient to support Hernandez's aggravated-robbery-with-a-deadly-weapon conviction. We overrule Hernandez's sole point of error.

### IV. Modification of the Judgment

The trial court's judgment does not show Hernandez's plea to the offense. The State asks us to modify the trial court's judgment to reflect that Hernandez pleaded "not guilty." While examining the trial court's judgment, we noticed another clerical error in the judgment: the sentencing date is incorrect.

---

[8]While there is testimony from Bravo and Sergeant Solano about one gunman or one gun, the jury also heard and was permitted to weigh their testimony against Davis's testimony of two gunmen with two guns jabbing him in the stomach.

On the first day of trial, Hernandez pleaded "not guilty" to the offense. The next day, Hernandez voluntarily absented himself from the remainder of trial. The jury found him guilty and assessed punishment against Hernandez in absentia.[9] That same day, the trial court sentenced Hernandez in absentia in accordance with the jury's verdict. Ten months later, Hernandez was apprehended, and the trial court sentenced him in person in accordance with the jury's verdict.[10] Hernandez then appealed.

The trial court's judgment does not reflect the correct sentencing date or Hernandez's "not guilty" plea. It is well established that we may modify a judgment to make it speak the truth. *See French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *see also* Tex. R. App. P. 43.2(b). When the oral pronouncement of a sentence varies from the written judgment, the oral pronouncement will control. *Ex parte Madding*, 70 S.W.3d 131, 135 (Tex. Crim. App. 2002) (citing *Coffey v. State*, 979 S.W.2d 326, 328 (Tex. Crim. App. 1998)). Here, because the written judgment does not reflect

---

[9]In a felony prosecution, the defendant must be personally present at trial, but if he "voluntarily absents himself after pleading to the indictment or information, or after the jury has been selected when trial is before a jury, the trial may proceed to its conclusion." Tex. Code Crim. Proc. Ann. art. 33.03; *see id.* art. 37.06 ("In felony cases the defendant must be present when the verdict is read unless his absence is wil[l]ful or voluntary.").

[10]Generally, a defendant must be sentenced in person. *See id.* art. 42.03(1)(a). If no sentence is pronounced or is improperly pronounced, a trial court may later properly pronounce the sentence, and a defendant may then appeal. *See Clemons v. State*, 414 S.W.2d 940, 941 (Tex. Crim. App. 1967); *Pruitt v. State*, 737 S.W.2d 622, 623 (Tex. App.—Fort Worth 1987, pet. ref'd).

Hernandez's "not guilty" plea or the correct sentencing date—November 11, 2019—we will modify the judgment accordingly.

## V. Conclusion

We modify the judgment (1) to delete and replace "1/17/2019" as the "Date Sentence Imposed" with "11/11/2019" and (2) to add "Not Guilty" as the "Plea to the Offense." Having overruled Hernandez's sole point of error, we affirm the judgment as modified. *See* Tex. R. App. P. 43.2(b).

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 1, 2021

14